158 N.J. Super. 313 (1978)
385 A.2d 1280
SALLY G. TURNER, PLAINTIFF,
v.
JOHN D. TURNER, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided April 6, 1978.
*314 Mr. Daniel G. Covine for plaintiff.
Messrs. Greenberg & Feiner for defendant (Mr. Robert Greenberg appearing).
IMBRIANI, J.C.C.
Is rehabilitative alimony available as a technique to resolve matrimonial disputes? Our statute is silent.
Inherent in such a determination are the questions (1) does a divorced woman (albeit on some occasions we will be dealing with a man) have a duty and obligation to seek suitable employment to maintain herself in the style of living to which she became accustomed during the marriage, and (2) may a court take cognizance of and terminate alimony on a predetermined date on the basis of reasonably foreseeable future events?
Rehabilitative alimony may be defined as alimony payable for a short, but specific and terminable period of time, which will cease when the recipient is, in the exercise of reasonable efforts, in a position of self-support.
Its purposes are multifold. It will direct a wife to seek and develop within a precise time period skills necessary to *315 obtain suitable employment. It will provide the husband with some certainty of the nature and extent of his obligation to his former wife. It will permit a court to consider reasonably foreseeable future events involving the parties and make a present determination of when alimony shall cease, which hopefully will avoid further recourse to our courts. Assuredly this will not always occur. But with sufficient information, finality should occur in the vast majority of cases.
A marriage has been destroyed and the court is called upon to play a role in the future lives of these litigants. What should that role be? As to alimony, it has historically been limited to an analysis of past and present facts in order to render a contemporary award of permanent alimony, which is made without any time limitation. Future events are ignored. The court does not anticipate what will or should occur in the future and make anticipatory decisions based thereon. We hope that the recipient will attain self-sufficiency. But we do not exert judicial might to encourage that end. Is such a traditional approach in awarding alimony in the best interest of the litigants?
None would dispute that the court should create an environment which will assist both parties in seeking and pursuing an independent path in life. Alimony, to the man, if unnecessary and a burden, will be an impediment; to the woman, if it causes her to live a life of physical and mental indolence, it will also be an impediment.
Our statute does not mandate alimony. It provides that a "court may award alimony to either party." N.J.S.A. 2A:34-23 (emphasis supplied). In the past alimony has been liberally granted and without time limitation, but terminable upon death of either or remarriage of the recipient. (Many voluntary agreements also terminate alimony when a former wife cohabits with an unrelated male.)
This court has previously addressed itself to some of the reasons for granting alimony, Lynn v. Lynn, 153 N.J. Super. 377 (Ch. Div. 1977), and noted (at 382) that while "women were formerly excluded from the employment market, *316 then accepted on a limited basis, they are now widely accepted by industry." What began as an elitist movement for "women's liberation" only a decade ago, now appears to have taken root as a profound and deep social change. Indeed, today there are many women who have considerable skills and are able to command salaries far in excess of what many men earn. It is imperative that courts recognize that society has changed.
Alimony should not, as one court said, permit "a wife capable of work to sit in idleness", Guindon v. Guindon, 256 N.W.2d 894, 898 (S.D. 1977). Another, "they [women] are no longer per se entitled to a perpetual state of assured income or, as some would characterize it, assured indolence." Grinold v. Grinold, 32 Conn. Sup. 225, 348 A.2d 32, 33 (Sup. Ct. 1975). Of course, it will be for the court to sift all of the facts of each case to determine whether such concerns are present.
Divorce was once a badge of shame and dishonor. Even with a disastrous marriage, a wedded pair considered it unthinkable to seek a divorce.
But today our courts are deluged with an avalanche of divorce suits. It is said that out of every 1.8 marriages in New Jersey today, one ends in divorce. As a result, the average matrimonial litigant has undergone transmutation. In the past we dealt with men of means who had the ability to maintain two households. Now we deal with the store clerk, the assembly line operator, the building custodian and a host of other blue-collar workers. Unlike litigants of the past, these men cannot maintain one household, much less two, in the same style to which they and their former wives were accustomed. In this milieu should a divorced woman be required, as a matter of law, to put her skills to use, and if she has none, to develop appropriate skills, if possible, to acquire a job?
In the past our attention was riveted upon the needs of the rejected wife. This was because most men in the matrimonial courts had the ability to maintain two households. *317 But today our primary attention is addressed to what the man can afford to pay. The solution often becomes complicated because it is not uncommon for many men to remarry and raise new families.
The law should provide both parties with the opportunity to make a new life on this earth. Neither should be shackled by the unnecessary burdens of an unhappy marriage. This is not to suggest that women of no skills, or those who suffer a debilitating infirmity, or who are of advanced age (whatever that may be) should be denied alimony for as long as needed. But such women are the exception, not the rule.
If we are to encourage a woman to seek employment, what better way is there than to direct that alimony will be rehabilitative in nature and will cease on some predetermined date? A permanent award of alimony in futuro with the hope that a woman will seek employment has not and will not work.
Some ask why impose a time limitation? It is not sufficient to permit a man to petition the court for modification of alimony when there is a change of circumstances? Such an inquiry misconceives the problem. What is needed is a system which will encourage a woman to develop skills and seek employment  not one that will address a situation when and if it should arise. The court must design a blueprint for the future which will have "teeth" to compel a recipient of alimony to obtain employment.
Our cases are replete with language that a divorced woman is entitled to be maintained in the style of life to which she became accustomed during coverture. Yet we all know that in the vast majority of cases we hear today that is not possible. Where the parties were required to spend during coverture practically all of their income, with little or no savings, to maintain a certain living style, it takes no great insight to appreciate that following the divorce neither will *318 have access to the same amount of funds and both will have to scale down their style of living.
This is not unique to divorced couples. Even where we have a happy marriage, when the man dies his widow must fend for herself on the reduced income of a pension; for some there is no pension. To live even close to her previous style of life, the widow must seek employment.
We know that when a woman has maintained the household for many years, while caring for the family, she has been deprived of the opportunity to acquire marketable skills, and has lost whatever such skills she once possessed. During this time her husband has developed and improved his employment skills. Under these circumstances, it would be inequitable to thrust a woman into the employment market without first ascertaining whether she has the potentiality to obtain suitable employment and, if so, to afford her sufficient time to acquire employment skills. If the court finds that such a potentiality exists, it can determine the time a woman would need to acquire such skills and award her rehabilitative alimony during that time. It may even direct that marital assets subject to equitable distribution shall be first used to pay educational costs she may need to develop or upgrade her skills.
Such a program affords multiple advantages to the woman. She will receive financial assurances within an appropriate period to plan her future with a minimum of financial concern, but nonetheless with the foreknowledge that alimony will cease on a predetermined date. She can look forward to pursuing a career of her own which will yield valuable emotional and psychological dividends. She can enjoy the self-fulfillment and rewards of entry into the employment market  a goal of the modern day women's movement.
Rehabilitative alimony, since awarded for a brief period of time, may well be for a sum greater than would have been awarded as permanent alimony. Further, the allowance of rehabilitative alimony does not preclude an allowance of permanent alimony where the woman's abilty to earn is less *319 than her needs that will be necessary to maintain her same style of living. Where appropriate, both can be awarded. For instance, if a woman requires $500 a week to maintain her style of living, and the court determines that with a two-year training period she could earn $100 a week, there should be nothing to preclude an award of $400 a week permanent alimony and $100 a week rehabilitative alimony that would cease in two years.
The advantage to the man is evident. He can now make meaningful plans for his own personal and financial future. In the past a woman could remarry without being inhibited by the burdens of an earlier marriage. But this path was not available to many men who found alimony a significant obstacle. Indeed, Testut v. Testut, 34 N.J. Super. 95 (App. Div. 1955), when addressing an application to reduce alimony and support said:
For purposes of consideration of the ex-husband's capacity to maintain them [his first wife and their three children], he should be treated as if he were simply living in a state of separation from his family. The obligation to support that family is paramount and the extent of the obligation measured in dollars is not to be limited or qualified by his remarriage. If it appears that his financial status is such that he can maintain his first family as its members were maintained prior to the divorce, the fact that a second marriage makes it burdensome or inconvenient to do so or occasions a deprivation of some desired luxuries or conveniences, or makes it difficult or impossible to live in the second marriage in the style and on the scale that his income would permit if the primary duty did not exist, provides no basis for reducing outstanding support orders; nor does it stand in the way of an increase thereof if the changed circumstances of the first wife make this equitable. [at 100]
A literal application of Testut would foreclose remarriage for many men. So, one must question the vitality of Testut today. Indeed, many concepts relating to alimony which were formulated in the past in the era of fault divorces should, with the advent of no-fault divorces, now be reassessed.
Both would benefit immeasurably with the knowledge that tremors of this dead marriage will lapse at some predetermined *320 date and not fester forever the animosity that inheres in all divorces. And of course, society would benefit because both will contribute to their community and neither will place undue reliance for support upon the other.
This court could find no statute or reported case in New Jersey which used the phrase "rehabilitative alimony." Research disclosed at least three states that did not have a statute concerning rehabilitative alimony and either permitted it or did not reject the concept. Morgan v. Morgan, 81 Misc.2d 616, 366 N.Y.S.2d 977 (Sup. Ct. 1975); Guindon v. Guindon, supra (South Dakota); Thomas v. Thomas, 217 Va. 502, 229 S.E.2d 887 (Sup. Ct. App. 1976). There are several states that have statutes expressly permitting it, viz., Florida and Connecticut.
Turi v. Turi, 34 N.J. Super. 313 (App. Div. 1955), listed ten factors to be considered in "fixing the amount of support." One was "the wife's age, condition of health and ability to earn support" and said "[s]elf-support whether of men or women, is to be encouraged." (At 323; emphasis supplied). The court never addressed the question of how to encourage that purpose.
Many cases followed, but critical were the twin cases of Khalaf v. Khalaf, 58 N.J. 63 (1971), and Capodanno v. Capodanno, 58 N.J. 113 (1971). Khalaf involved a "prosperous suburban dentist" (at 66) whose "evasive tactics throughout the litigation" (at 68) did not make him a sympathetic litigant. Capodanno involved a husband who "had ample means to meet any support order the court might make." (At 117). Thus neither husband is the usual type we meet today. Khalaf held (at 69) that "we do not think that Mrs. Khalaf should now be required to work," and "he must support his wife in the same manner as if he had not wrongfully left his home * * * especially so in light of defendant's ample means and his wife's lack of any substantial employment experience." (At 70). So, too, Capodanno directed that "[a]s long as he can afford to, he should support her in her accustomed pattern now that they *321 have separated, and she should not be obligated to work to lighten his burden." (At 120).
Next came Scalingi v. Scalingi, 65 N.J. 180 (1974), which did not recite much of the evidence but, significantly, said that where the husband argued that his 60-year-old wife was able to support herself, the trial court should consider "the respective incomes of the parties." (At 184). Was this a wedge undermining Khalaf and Capodanno? The amount of alimony awarded in Scalingi was only $75 a week, a sum unlikely to maintain anyone according to even a minimal living style. Our Supreme Court is becoming exposed to the usual case we now see in the matrimonial courts. The holding of Capodanno that a woman "should not be obligated to work to lighten his burden" must be limited to the case where a former husband is able to support two households.
This court believes that Scalingi has signaled a new philosophy, which is that a divorced woman, when able, should be required to mitigate the burden of her former husband to pay alimony by utilizing either her own financial means or her earning potential, or both.
There has now arrived Stout v. Stout, 155 N.J. Super. 196 (App. Div. 1977), which does not use the phrase "rehabilitative alimony" but does discuss the concept. At first blush one might think the concept was rejected. But a detailed reading suggests otherwise.
In Stout there were four minor children, one of whom was born with a physical defect. The husband's average annual gross income was about $15,000-$16,000. The trial court directed him to pay $165 a week and, strangely, directed that the allocation between alimony and support was to be in a fashion determined by counsel. They set alimony at $50 a week. The court also ordered that the marital home be sold in two years, and that alimony terminate at that time.
The Appellate Division reversed for two reasons. It noted, first, that alimony is to be determined by the court, not counsel, and on the basis of relevant factors, and second, that "there is no evidence in the record to support" the cessation *322 of alimony when the house is sold. Indeed, the Appellate Division found undisputed facts that militated against a cessation at that time, i.e., three of the children would still be minors, including the handicapped child; the outlook for any substantial increase in the wife's earnings of $750 a year was "purely conjectural"; living expenses for the wife were likely to increase, and her portion of the net proceeds from the sale of the home would not be substantial enough to provide her with "real and meaningful assistance." (At 205). This is the precise holding of Thomas v. Thomas, supra, which set aside a judgment limiting alimony to two years because "[t]he record here is devoid of any evidence that Mrs. Thomas' needs or Mr. Thomas' ability to provide for that need would substantially change within the immediate or reasonably foreseeable future." (229 S.E. 2d at 890).
Stout then concluded (155 N.J. Super. at 205) that "[t]here should not be an automatic decrease or cessation of the payment of alimony based on a future event." That sentence should not be read literally, but within the context of the specific facts of that case, which did not justify the termination of alimony in two years. Decisions are not rendered in the abstract but on the basis of the precise facts before the court. If the cessation of alimony could realistically be justified by the facts, it may well be permissible, and perhaps even desirable, that it be ordered. This court does not read Stout as prohibiting an award of rehabilitative alimony, if the facts so justify.
At least two arguments are urged in opposition to rehabilitative alimony. First, it is said the statute does not permit it. But, conversely, neither does the statute preclude it. If a court is entrusted with the enormous responsibility of designating whether to pay alimony and, if so, the amount, does it not have inherent power, in the absence of an express statutory prohibition, to determine whether alimony should cease on some future date or event? Second, it is said there is no harm to the husband in awarding permanent *323 alimony because he could always return to court for a cessation of alimony upon a showing of changed circumstances. But this reasoning ignores the societal and individual benefits that would inure from a judgment that will motivate a woman to seek employment. It fails to appreciate that permanent alimony does not encourage a spouse to seek employment. Indeed, it does just the opposite.
DiTolvo v. DiTolvo, 131 N.J. Super. 72 (App. Div. 1974), did not preclude rehabilitative alimony when it said (at 77) that the "advance determination by the court of an automatic increase is contrary to established principles relating to alimony and the modification thereof." The holding of DiTolvo should be limited to the facts of that case wherein the trial court (at 75) ordered an annual increase of alimony in the sum of "50% of his net salary raises." As the Appellate Division said (at 76), "many factors other than the amount of money earned or to be earned by the husband" must be considered in fixing alimony, and, indeed, such a provision was tantamount to permitting "the probation department to amend the judgment as to alimony without court approval when the department has evidence of an increase in the husband's salary." (At 77). Rehabilitative alimony does not require a review by anyone.
This court is satisfied that rehabilitative alimony is a valuable technique and one that is available today in New Jersey. There is no statute or case directly prohibiting its use.
The facts of this case are unusual. The parties have been married for 22 years. There are three children, one of whom is emancipated; the wife has custody of the others, who are 13 and 17 years of age. The 17-year-old will graduate high school in June 1979 and probably go on to college. The 13-year-old has not displayed college potentiality at this moment.
The wife is 45 years of age and has attended Ohio State University. In the past seven years she has taken part-time employment, including as a reading teacher at a private *324 school. Several years ago she matriculated at Kean College and will graduate in August 1978 (some six months hence) with a degree as a Reading Specialist. She presently works at Kean College and receives a salary of $50 a week plus free tuition. Upon graduation she anticipates earning $12,000 a year. In addition, when the house is sold in the summer of 1979 (because it will be too large for only the wife and one child) the wife will have received equitable distribution from all sources of at least $80,000 in cash. The husband will provide support for the children, including their college expenses. Her obligations will essentially be limited to maintaining herself.
The husband is 49 years of age and a civil engineer who earned $31,000 in 1977. In addition, he receives a military pension of about $5,000 a year, of which more is said infra.
What makes this case unique is that the husband was involved in an airplane accident while in the U.S. Navy two years before marriage. He lost his left leg. His right leg sustained serious damage and its condition has progressively deteriorated. He is seriously concerned that he may also lose his right leg which he believes will prevent his continued employment. It is because of this concern that this family has lived a relatively frugal life and has always implemented a savings program. As a result of the injuries received in the airplane accident, he receives a government pension, which his wife concedes was vested prior to the marriage and is not subject to equitable distribution.
Considering (1) the substantial sums that each will receive by way of equitable distribution, (2) the earning ability that both will enjoy by the time the house is sold, and (3) the necessity that the husband save a greater sum than usual because of his physical condition, fairness and equity dictate that rehabilitative alimony of $50 a week be awarded to the wife, which shall cease on September 1, 1979. By that time the wife will have completed one full year of employment in her new position as a reading specialist. She will have only the 15-year-old child at home, whom *325 the husband will support. The interest income she will earn from her share of the marital assets, together with her salary and child support payment, will adequately satisfy her needs and enable her to maintain the style of living to which she is accustomed.