709 A.2d 261

DANIEL J. HUGHES, PLAINTIFF–RESPONDENT, v. MARIANNE S. HUGHES, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 31, 1998—Decided April 29, 1998.

Before Judges DREIER, KEEFE and PAUL G. LEVY.

*Barry D. Szaferman,* argued the cause for appellant (*Szaferman, Lakind, Blumstein, Watter & Blader,* attorneys; *Mr. Szaferman,* of counsel, *Jennifer Weisberg Millner,* on the brief).

*David E. Ferguson,* argued the cause for respondent (*David E. Ferguson & Associates,* attorneys; *Mr. Ferguson,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendant, Marianne S. Hughes, appeals from the economic provisions of the parties' judgment of divorce. Plaintiff, Daniel J. Hughes, and defendant were married on June 11, 1983. They have one child, a daughter, born May 22, 1984. Approximately three months after the parties' tenth anniversary, plaintiff filed for divorce alleging extreme cruelty, and defendant filed a counterclaim. The divorce was entered on the basis of an eighteen-month separation. The trial judge resolved various economic motions in a pendente lite order and established temporary support of $3000 per month for defendant and $1000 per month child support. The judge, however, declined to order either party to pay overdue mortgage payments during the pendency of the divorce proceedings, stating that he was attempting to pressure the parties to sell the marital home. The $4300 per month mortgage payments were greater than the amounts defendant was receiving, and she contended that she could not make the payments. Plaintiff stopped making payments on the mortgage in January 1995. Defendant therefore accumulated what she could from the support payments and held these mortgage funds separately while she attempted to

negotiate with the mortgagee for a partial settlement so that she could remain in the home. By the time of the divorce trial, defendant had accumulated $14,000, $12,000 of which was kept in a bag in her house. She was, however, unable to resolve the mortgage payment issue with the bank, which had placed the home in foreclosure.

The judge tried the case commencing September 1995, and concluding on three days in March and April 1996. Although the judgment of divorce was signed August 2, 1996, the final order for custody, visitation and equitable distribution was not executed until October 1, 1996.

Prior to the parties' marriage in 1983, defendant had worked as a waitress while earning credits towards a music education degree at the Boston Conservatory of Music. Plaintiff was a commercial real estate agent at Coldwell Banker, earning $230,000 a year. He induced defendant to quit her job and obtain a real estate license. For a short time she worked as a residential real estate agent, but then quit before the parties' child was born in 1984. In October 1987, plaintiff left his job and, with two partners, formed Metro Commercial Real Estate, Inc., a corporation that functioned as a leasing agent for retail space. Initially, plaintiff owned only fifty percent of the company, but in 1990 he bought out his partners' interests and became Metro's sole shareholder. His income with Metro was initially far less than it had been with Coldwell Banker, plaintiff having received only $50,000 in the first year of Metro's operation. However, in subsequent years the business improved, so that in 1993 his adjusted gross income increased to $118,405; and in 1994 his adjusted gross income equalled $248,000, which included a salary of $114,511 with an additional nonrecurring capital gain of $74,000 from selling his share in two real estate endeavors.[1]

---

[1] The two interests that plaintiff sold involved a partnership, Sharon Hill Limited Partnership (actually Sharon Hill Chester Pike, LP), and SL–Parkway

The parties' lifestyle reflected plaintiff's financial prosperity. They lived in an eleven-room house with an in-ground swimming pool and had occasional domestic help. Plaintiff purchased an Audi for defendant and a Mercedes for himself. They enjoyed vacations to Disney World, Florida hotels and the Caribbean, and sailing trips to Maine, Nantucket and Newport. They dined at restaurants regularly and provided their daughter with violin, acting, gymnastics, horseback riding and skating lessons.

Although defendant initially did some work at Metro, plaintiff asked her to stop, and she became a full-time homemaker. She did, however, make a loan of $5000 to begin a property management arm of Metro. Shortly after their daughter was born, plaintiff was treated for an alcohol abuse problem, and while he was hospitalized, the household bills and mortgage fell into arrears. They survived this period with the assistance of relatives, savings, loans and defendant's management of their finances. Similarly, during the real estate recession of the late 1980's they underwent another brief period of financial difficulty. However, they maintained their lifestyle by borrowing money from plaintiff's corporation. They would then repay the money to the corporation by borrowing money on their credit cards. At the time of the parties' separation in July 1993, the outstanding credit card debt was approximately $73,000. The financial problems allegedly worsened after the separation, but defendant contends these were problems in appearance only, as is discussed *infra*. In April 1994, plaintiff owed $20,412 to the corporation, and by March 1996 this debt increased to $116,260. He attributed the debt to payment of $28,000 in federal and state taxes, $14,000 in interest payments, $70,000 in marital debt that was paid, and his current living expenses.

Because of their mounting debts, the parties agreed to sell the marital home. It was originally listed for $475,000, with the price

---

Corporation which present a problem in equitable distribution that will be discussed *infra*.

gradually lowered so that at the time of trial it was listed at $399,000. Some offers were received but negotiations broke down because of the parties' dispute concerning the condition of the house, and no agreement of sale was ever executed. Defendant did not wish to lower the listing price any more, and plaintiff countered by refusing to pay the $4300 mortgage payments as of January 1995. As noted earlier, defendant's attempt to settle with the mortgagee was rejected.

Plaintiff's style of living still includes vacations, such as sailing excursions, trips to the New Jersey shore, skiing trips to the Poconos and Colorado, and a trip to San Francisco. He pays $1600 per month for a townhouse where he has domestic help, and he contributes $3000 for his daughter's summer camp, sports recreation, and theater lessons. Defendant, on the other hand, has greatly cut back her living expenses and has incurred debt to her family and friends. She has no domestic help, maintaining the house herself. In the eighteen months prior to trial, her entertainment had consisted of seeing two movies, window shopping at a mall, and an occasional meal at a restaurant. Her vacations were one overnight trip to Cape May, a two-night trip to Lake George and excursions into New York City.

The parties obtained joint custody of their daughter, with defendant designated as the primary caretaker. Defendant does not dispute the characterization that plaintiff is the daughter's caretaker forty percent of time while she is responsible sixty percent of the time.

The trial judge agreed that defendant should be given the ability to finish her education and become a vocal instructor as she had intended prior to her marriage.[2] The judge, however, placed great emphasis on the length of the marriage, the age of the

---

[2] Plaintiff was ordered to pay defendant's educational costs with a limit of $5500 per semester and $400 per credit hour for her master's degree. Defendant contests this limit, but we do not find it unreasonable, if the other errors are corrected on remand.

parties and their physical and emotional health. He ordered rehabilitative alimony only, to be paid in the amount of $3000 per month for eighteen months retroactive to May 1, 1996, and thereafter at $2000 per month for thirty months, basing this sum upon an imputed income to defendant of $1000 per month. Thus, the total period for which defendant would receive alimony was four years. The court also ordered plaintiff to provide life insurance in the amount of $200,000 with defendant as the beneficiary until the alimony obligations ceased and an additional policy for $500,000 with the child as the beneficiary until emancipated.

Defendant was directed to transfer her interest in the marital home to plaintiff who was to remain solely responsible for deficiencies in the foreclosure action. At the time of the trial there was approximately $390,000 owed to the mortgage company (including late fees, back interest, legal fees and foreclosure fees), and as noted earlier, the last listing on the house was for $399,000. Plaintiff, however, was given all tax benefits relating to the ownership of the property.

The parties were permitted to keep their own IRAs in the approximate amount of $5000 each, and certain Service Care Center stocks were divided equally between the parties. Defendant kept her Audi, with a value of $3000, and her jewelry, which was valued at $11,000. She also retained the $14,000 which she had saved to attempt to settle with the bank on the mortgage. An income tax refund was divided one-third to plaintiff and two-thirds to defendant. A $91,000 note from plaintiff's former partners was awarded solely to plaintiff as an offset against amounts that defendant owed plaintiff for the payment of 1994 taxes. Defendant's $45,500 interest in this note approximately balanced the $45,000 due from defendant for taxes, and the judge therefore let plaintiff retain the note payments he had received since the complaint was filed. This will be discussed *infra.*

The parties had agreed that a joint expert could value plaintiff's business. Although defendant disputed the valuation when it was presented at trial, she presented no contrary expert. She again

contends here that the value should be considerably higher than the $115,000 determined by the joint expert. From this she was given a credit of $57,500 from which was deducted the value of the Audi and jewelry ($14,000), leaving her a net amount of $43,500. The judge refused to divide plaintiff's interests in Sharon Hill Limited Partnership and SL–Parkway Corporation, and further concluded that defendant was responsible for thirty-five percent of the $115,432 outstanding debt, thus reducing the net amount to be awarded to her to $3000. There were some additional credits to which she was entitled, raising the net amount due to her to $5000. Plaintiff was additionally ordered to pay $12,000 for defendant's attorney's fees.

## I.

Defendant raises seven points on this appeal, some with subpoints. She first asserts that the court was biased against her and argues globally that the net effect of the distribution was that plaintiff retained the house, which he was suddenly able to redeem from foreclosure and on which he could keep up the mortgage payments. He also retained his business, which generates sufficient funds for him to pay the various debts, portions of which although initially allocated to defendant, had been set off against her share in the value of the business, leaving her a mere $3000. As a result, defendant has been forced to live at a greatly reduced lifestyle with minimal temporary alimony, while plaintiff has not appreciably changed his standard of living.

From these facts and expressions the judge made at the time he refused to order plaintiff to keep up the mortgage payments in addition to the pendente lite alimony, defendant concluded that the judge had exhibited bias. The judge, however, explained why he had attempted to force the parties to sell the house, and our view of the record shows no hint of bias expressed or shown toward either party. This is not to say that we agree with the various aspects of this award, or even that they are sustainable,

but only that the judge's decision, as explained by him was free of bias or prejudice.

This case is totally unlike *Greenberg v. Greenberg,* 126 *N.J.Super.* 96, 312 *A.2d* 878 (App.Div.1973) or *Monte v. Monte,* 212 *N.J.Super.* 557, 515 *A.2d* 1233 (App.Div.1986), cited by defendant. The judge made no naked conclusions here, but set forth his factual findings in regard to custody, alimony and equitable distribution. He provided a rationale for his decision in a comprehensive twenty-page opinion. The single expression by the judge, that defendant might be more to blame for the foreclosure because she had failed to pay the mortgage using the monies given by plaintiff, was incorrect in that she certainly could not make a $4300 payment from the $4000 she was receiving and still have funds available to feed, cloth and provide for miscellaneous expenses for herself and daughter during this period. Despite our disagreement, we in no way challenge the judge's good faith.

## II.

■ Defendant next urges that Metro was greatly undervalued for the purpose of this award. Specifically, she points to an asset of the corporation, a shopping center catalog, which she contends itself was worth in excess of $100,000. We note that although plaintiff had bragged that this catalog was an excellent selling tool and that it had cost $100,000 to develop, its independent worth was negligible. It required constant updating and was merely a compendium of outstanding available property. It was one vehicle that permitted plaintiff to earn his substantial income from the business. The business, however, did not necessarily have any great intrinsic value. It was more of a personal service corporation whose value was dependent on plaintiff's services which generated the firm's income.

Although defendant challenged the expert's valuation, the court was free to accept it, as it did. The parties had stipulated to the joint expert's qualifications and defendant provided no expert testimony to refute the joint expert's conclusions. In making his

evaluation the expert used the criteria specified in Revenue Ruling 59–60, 1959–1 C.B. 237. After analyzing the eight factors, he applied two methodologies to determine the value of the business, rejecting an excess earning method which yielded under $70,000, but accepting the capitalization of earnings method which yielded $115,000. Had he given independent value to the catalog of shopping centers, it merely would have brought the excess earnings value closer to the capitalization value that he had used. Therefore, on the facts in this record, we cannot say that the judge erred in accepting the expert's valuation.

### III.

Defendant next challenges the judge's failure to include the Sharon Hill and SL–Parkway assets as proper subjects for equitable distribution. Defendant contended that during the parties' marriage they contributed $64,000 for their interest in Sharon Hill Limited Partnership, and she had been told by plaintiff that these interests would be part of their retirement. Plaintiff agrees that he became a shareholder in the limited partnership prior to filing the divorce complaint, but he contends the partnership did not own assets until after the complaint was filed. He explained that he did not purchase his interest, rather it was given to him in consideration for his contribution as a real estate expert in finding tenants for the shopping center after the partnership acquired it.

We find that this explanation did not remove the partnership interest as an equitably distributable asset. If the partnership's plans to purchase the shopping center were put in place, and plaintiff had agreed to provide the service of finding tenants, the interest in the partnership may have had substantial value at the time the complaint was filed. When the other parties to the agreement may have advanced their funds to purchase the shopping center made no difference to the interest of plaintiff. If the agreements to fund the partnership were in place, plaintiff owned his percentage whether this advance was made the day following the filing of the complaint or five years later.

There might be some adjustment of this value depending upon whether plaintiff had additional services to perform for which he would not be compensated. If his future services were to be compensated by commissions, and his efforts finding the tenants were to be paid by the partnership when he performed, then the full value of his partnership interest should have been included for equitable distribution. If on the other hand he received this interest in lieu of future commissions, then it might be equitable to reduce the value of his interest in the partnership by the reasonable value of those commissions, because defendant would have no right to share in plaintiff's future income, at least for equitable distribution purposes. Given plaintiff's future active involvement in the partnership's business, the interest should probably have been awarded to him, with a suitable monetary award to defendant. *Valentino v. Valentino*, 309 *N.J.Super.* 334, 338–40, 707 A.2d 168 (App.Div.1998) (involving a gas station, a pre-marital asset of the husband enhanced by the parties' efforts, where the wife was given ten percent of the value).

Unfortunately, there were inadequate findings on this issue, and the matter concerning this partnership must be considered on remand. We note that defendant's claim of a $64,000 loan to the Sharon Hill Limited Partnership was answered by plaintiff's assertion that the loan actually was for Metro and was later repaid. We cannot determine whether this loan was shown as an asset of Metro when the valuation was made by the joint expert. If it was not, then, of course, the valuation of Metro should have increased by $64,000 and defendant would be due one-half of this value.

As to SL–Parkway Corporation, plaintiff contended he was not a shareholder but merely a property manager.[3] The judge did

---

[3] Plaintiff asserts that he became a shareholder September 21, 1993, one day after the divorce complaint was filed. It is difficult for us to believe that this was coincidence or that there had not been a previous agreement, prior to the filing of the complaint, that plaintiff would be given his interest in the corporation on this date. We cannot lose sight of the fact that the Family Part is a court of equity. Furthermore, under *Pascale v. Pascale*, 140 *N.J.* 583, 609, 660 A.2d 485

not sufficiently resolve this issue, but it should be analyzed in the same manner as the partnership. If plaintiff was actually an owner and was paid separately for his property manager duties, then his ownership interest should be valued. If he was an owner, but the property manager duties were the consideration for his being given the interest, then a reasonable value of his income for these duties should be deducted from the value of the partnership interest.

At oral argument before us, plaintiff claimed that it would be unfair to insert defendant as a limited partner or as an owner of the close corporation, and in fact such outside ownership might violate either the partnership agreement or a shareholder agreement. If the interests have been sold as claimed by plaintiff, the issue is moot, because a monetary adjustment is all that is needed.[4] If not, as stated to counsel and restated here, this distribution issue presents no real impediment. Of course, it would be better to value the interest and give defendant her share up front, but such valuation is often difficult. We have treated this issue in other situations where a party has been precluded by law from being a shareholder, but the uncertain nature of the investment required a division in kind rather than a valuation and a cash offset. The judge need not order, for example, that defendant be made a limited partner to the extent of some percentage of plaintiff's interest in the Sharon Hill partnership. He could merely direct that defendant is entitled to her share of any periodic distributions that plaintiff may receive from the

---

(1995) and *Landwehr v. Landwehr*, 111 *N.J.* 491, 504, 545 *A.2d* 738 (1988), a party seeking exclusion of an asset has the burden of establishing its immunity from equitable distribution. Plaintiff presented no proofs concerning the state of his agreements concerning the corporation prior to the filing of the complaint other than the shareholder agreement itself. Until the underlying facts were unearthed, he had denied he was a shareholder and claimed merely to be a property manager.

[4] Plaintiff's claims that the partnership and corporation interests had no value are belied by the record which reveals that in 1994 plaintiff sold his shares in Sharon Hill and SL–Parkway for $74,000.

partnership and her share of the total consideration received in the event of a sale or exchange of plaintiff's interest. A copy of the court order can be given to the partnership, or an assignment of proceeds filed so that plaintiff will not suffer any adverse tax consequences and payments may be made directly by the partnership to defendant. A qualified accountant or tax attorney could provide the proper vehicle for accomplishing this result.

### IV.

█ Under defendant's next point she claims that the amount of child support established by the court was insufficient. We agree with defendant under the laws that existed at the time of the decree, and perhaps more so today. Plaintiff's weekly income was over two and one-half times the maximum in the child support guidelines which were then capped at $1000 per week. At $1000 the guidelines would have awarded between $193 and $214 per week, and then would have supplemented this amount with additional support based upon the remaining family income applying the factors set forth in *N.J.S.A.* 2A:34-23. The judge, however, supplemented the baseline amount by only $18.55. We determine that the judge inadequately weighed the factors in determining the child's needs, in particular the obvious upper-middle-class standard that had been set by her parents, plaintiff's $11,000 per month salary as compared to defendant's unemployment, and the disparity of the earning potential of each parent. *N.J.S.A.* 2A:34-23a(1) to (4). *See Pascale v. Pascale, supra,* 140 *N.J.* at 594, 660 A.2d 485; *Dunne v. Dunne,* 209 *N.J.Super.* 559, 566-67, 508 A.2d 273 (App.Div.1986).

█ The judge's conclusions that the child support and alimony (which will be separately discussed, *infra* ) awarded would not seriously impair both defendant's and the child's current standard of living is simply unsupported by this record, unless by this standard of living the court meant the greatly reduced standard that defendant had been forced to endure while this case proceeded. This in no way reflected the upper-middle-class standard that

the parties had set during their marriage. Even if we were not to order, as we do, an increase in alimony as to amount and duration, the standard of living to be enjoyed by the parties' daughter should reflect plaintiff's financial status. *See Lepis v. Lepis,* 83 *N.J.* 139, 152, 416 *A.2d* 45 (1980); *Dunne v. Dunne,* 209 *N.J.Super.* at 567, 508 *A.2d* 273. The fact that defendant might be incidentally benefitted by the better housing, food, vacations or other attributes of the child's lifestyle is of no moment. *Walton v. Visgil,* 248 *N.J.Super.* 642, 650, 591 *A.2d* 1018 (App.Div.1991); *Zazzo v. Zazzo,* 245 *N.J.Super.* 124, 131, 584 *A.2d* 281 (App.Div. 1990), *certif. denied,* 126 *N.J.* 321, 598 *A.2d* 881 (1991). We also note that the judge assumed that plaintiff would continue to provide for the amenities formerly enjoyed by his daughter, yet these payments were not directed by the court. We see a significant problem in plaintiff paying directly for these enhancements, with defendant unable to do so in the event that plaintiff halts payments. This problem overlaps both the alimony and child support issues, and should be recognized by the trial judge on remand.

Because we are remanding this issue for reconsideration, we see no reason why the trial judge should not resort to the amended guidelines now contained in Appendix IX–F to the Rules of Court. Under these guidelines, plaintiff would be required to pay between $415 and $417 per week, approximately $182 per week more than that which defendant now receives as child support. The judge, of course, will use these guidelines for general guidance in establishing a new amount for child support.

## V.

One of defendant's principal challenges to the judgment relates to the alimony award. Defendant contends that she was entitled to permanent alimony; the court was in error in evaluating plaintiff's ability to pay; the judge's decision concerning alimony was punitive towards her; and the court committed error when it set the amount of rehabilitative alimony, requiring plaintiff

to pay only a portion of defendant's educational costs. We treat these separate objections generally, without answering them one by one.

There is no question that the amount of alimony will vary depending upon the standard of living of the parties during the marriage. *Lepis v. Lepis, supra,* 83 *N.J.* at 150, 416 *A.*2d 45. Bare survival is not the proper standard, it is the quality of the economic life during the marriage that determines alimony. *Ibid.* Rehabilitative alimony differs in that it is payable for a specific time period, ceasing when the dependent spouse is in a position of self-support. *Weber v. Weber,* 268 *N.J.Super.* 64, 71, 632 *A.*2d 857 (App.Div.1993). But again, self-support does not mean a subsistence level. Where the supported party prior to the marriage had lived at a lower standard of living than the supporting party and was elevated to the latter's standard of living during the marriage, self-support does not mean returning the supported party to the reduced premarital standard of living, unless the various factors set forth in *N.J.S.A.* 2A:34–23b call for such a conclusion.

In this case, the judge stressed that he considered this to be a short-term marriage, justifying the brief and minimal amount of alimony, even considering the even briefer period of slightly increased rehabilitation. First, we take issue with a ten-year marriage being considered a short-term marriage. By today's standards, it is not. We must look at the particular facts of this case. Before the parties married, defendant was working towards her degree to become a music teacher. She then quit and became a residential real estate salesperson for a short period of time, after marrying a man with an income well in excess of $230,000 per year. For ten years, through good times and bad, after he changed his business and she survived his problems with alcoholism, the parties were at the verge of plaintiff resuming his former income, but this time with plaintiff as the owner of a business rather than as a salaried employee. His present earning ability and business acumen were evident through the personal real

estate deals he was able to negotiate as well as his skills as a broker.

We find no fault with the judge having determined that, with a daughter entering her teens, defendant was able to resume training in her formerly chosen field and become a music teacher. During the training period she well could earn the $1000 per month attributed to her by the judge. Upon completion of her training, however, as a woman in her mid-forties and at the entry level in her profession, we doubt that she would initially earn more than $25,000–$30,000 annually, but there should be some proof concerning what she might expect. Rehabilitative alimony for the interim period until she was employed full-time was certainly called for, but the amounts were not commensurate with plaintiff's ability to pay, the parties' former style of living, and defendant's needs.

Another error we see is that the rehabilitative alimony was in lieu of, rather than in addition to permanent alimony. Rehabilitative alimony in addition to permanent alimony is favored, where appropriate. *See Kulakowski v. Kulakowski,* 191 *N.J.Super.* 609, 611–12, 468 *A.*2d 733 (Ch.Div.1982); *Turner v. Turner,* 158 *N.J.Super.* 313, 318–19, 385 *A.*2d 1280 (Ch.Div.1978); *see also Lepis v. Lepis, supra,* 83 *N.J.* at 155, 416 *A.*2d 45. The rejection of the sole remedy of rehabilitative alimony as suggested in *Arnold v. Arnold,* 167 *N.J.Super.* 478, 481, 401 *A.*2d 261 (App.Div.1979) in *Lepis v. Lepis,* 83 *N.J.* at 155 n. 9, 416 *A.*2d 45 is also instructive. The granting of rehabilitative alimony does not mean that permanent alimony must be rejected.

This is not a case such as *Skribner v. Skribner,* 153 *N.J.Super.* 374, 379 *A.*2d 1044 (Ch.Div.1977), where the marriage lasted for approximately a year and a half, or like *D'Arc v. D'Arc,* 164 *N.J.Super.* 226, 238, 395 *A.*2d 1270 (Ch.Div.1978), *certif. denied,* 85 *N.J.* 487, 427 *A.*2d 579 (1980), *cert. denied,* 451 *U.S.* 971, 101 *S.Ct.* 2049, 68 *L.Ed.*2d 350 (1981), where the marriage was of three and a half year's duration, and where the husband, a doctor, sought alimony. There, permanent alimony was properly withheld.

There are few, if any, cases of an intermediate length marriage where this issue is discussed. The Court in *Lynn v. Lynn,* 91 *N.J.* 510, 453 *A.*2d 539 (1982), explained that "the length of the marriage and the proper amount or duration of alimony do not correlate in any mathematical formula. Where the circumstances of the parties diverge greatly at the end of a relatively short marriage, the more fortunate spouse may fairly be called upon to accept responsibility for the other's misfortune—the fate of their shared enterprise." *Id.* at 518, 453 *A.*2d 539. *Lavene v. Lavene,* 162 *N.J.Super.* 187, 392 *A.*2d 621 (Ch.Div.1978) is also apposite. There the court noted that "this is not a situation where the marriage is one of extremely long duration, nor one in which plaintiff has geared her whole lifestyle to rearing a family." *Id.* at 203, 392 *A.*2d 621. In *Lavene,* the court recognized the principle of rehabilitative alimony by citing *Turner, supra,* and then determined that the amount of permanent alimony would be reduced because of the shorter term marriage, but not excluded. *Ibid.* In the case before us, there was also a marriage, "in which [the wife] has geared her whole lifestyle to rearing a family." *Ibid.*

Defendant is perfectly willing to follow the dictates of *Lepis* and provide for herself to the limits of her ability. After doing so, however, she should not be relegated to the position she would have been in if she continued to wait on tables and finally had obtained her education as a music teacher. Plaintiff's obligation to continue to support defendant is an incident of the commitment he made when he married her. Perhaps because the marriage was of an intermediate length, defendant need not be supported to the standards of the very summit of the parties' lifestyle, but defendant also is not to be cast adrift after four years of rehabilitative alimony.

On remand, the trial judge should reconsider this issue with a view that defendant is to receive permanent alimony, but perhaps at some reduced rate to reflect a marriage of this medium length. The rehabilitative alimony ordered should be blended into such an award so that once her capacity to earn income is established,

defendant's lifestyle can be maintained, perhaps not at the full level of plaintiff's, but somewhat reflective of how the parties lived during their marriage.

As to the question of the standard set during the marriage, the judge distinguished between the standard at which the parties actually lived and that which he determined they should have lived, what he called the "real" standard of living, without resort to excessive borrowing. The judge here confused two concepts. The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income. The parties here apparently determined that plaintiff was able to earn well in excess of $200,000 per year as an employee. They then started their own business and ran through some unstable financial periods during the temporary downturn in the real estate market. During this time they chose not to change the way they lived, even though it put them in debt, because they apparently realized that once the real estate market recovered, plaintiff would most probably resume his former income, enabling them to repay their debt without having had to change their standard of living. We have held payor spouses to this standard in many cases where there have been temporary setbacks in a business or even a change in careers. *See Lynn v. Lynn*, 165 *N.J.Super.* 328, 340–41, 398 *A.*2d 141 (App.Div.), *certif. denied*, 81 *N.J.* 52, 404 *A.*2d 1152 (1979) (relating to child support); *see also Arribi v. Arribi*, 186 *N.J.Super.* 116, 118, 451 *A.*2d 969 (Ch.1982). In *Lynn* we required that a payor resort to savings or credit in order not to reduce alimony or child support for a temporary setback in income. This is especially so when the couple made the same decision while their marriage was intact. 165 *N.J.Super.* at 341–42, 398 *A.*2d 141. Here we note that in setting the standards for the two spouses, the judge stated that defendant was to exist on support that would have kept her at the reduced level the couple would have had without borrowing, while the judge recognized in his opinion that plaintiff would most probably be able to

resume the higher standard of living at which the couple had actually lived during their marriage. We disagree with this approach.

The plaintiff's actual earnings may, of course, be considered, but not in the context of determining the standard of living that the parties had enjoyed during their marriage. The point of considering current earnings is to determine whether he is able to support defendant to the level enjoyed during the marriage (or to such somewhat reduced level, as we noted in our earlier discussion concerning the duration of the marriage). This evaluation is no different from that which the court usually makes to determine the gap that must be breached by alimony in accordance with the standards of *Lepis*. Thrown into this equation is the additional factor of child support, namely, how the alimony affects the child and how the child support may affect defendant.

Also, the court must consider that the alimony is deductible to plaintiff and is taxable to defendant. We see no discussion of this factor in the court's opinion, other than to consider plaintiff's after-tax income, without reference to an alimony deduction. When the amounts are considered, the court should look at the benefits and burdens, net of taxes.

## VI.

Defendant next asserts that there was error in determining her responsibility for thirty-five percent of the credit card debt. She contends that a portion of the $73,332 credit card debt as of December 1993 was attributable in large measure to the business, and was already considered in reducing the value of the business. It also was attributable to plaintiff's personal post-divorce expenditures. She further asserts that from plaintiff's $248,000 gross adjusted income he failed to pay the credit card debt so that she would have to share in it, and instead he spent his income on personal items such as furniture, clothing, stereo equipment, computers, vacations and a $150,000 loan to his brother. Thus, she says, it is inequitable that any portion of this debt

should fall upon her. She argues that the judge did not distinguish the various transactions comprising the credit card indebtedness. The same argument can be made concerning the debt in plaintiff's draw account from his business which totalled $42,100.

Defendant was assessed thirty-five percent of the combined debt of $115,432, or a total of $40,500. Our view of this record raises serious doubt in our minds concerning her responsibility for thirty-five percent of this debt, which appears to be an arbitrary figure set without reference to plaintiff's actual financial circumstances. If, in fact, plaintiff made a substantial loan to his brother (this obligation was apparently not the subject of equitable distribution) and bought substantial capital items with the money that he earned, and then ran up the debt to reduce his equitable division responsibilities, he, not defendant, should be charged with this debt.[5] With a gross income of over two hundred thousand dollars, we frankly cannot understand how the minimal payment which he was required to pay defendant could have caused this debt. If he chose to use his earned income for other purposes and to run up substantial debt, the obligation, except for some possible minimal amounts, should be his, not defendant's.

## VII.

■■■ Defendant lastly claims that she should not have been held responsible for fifty percent of the income tax liability for 1994–95. The judge held that defendant was entitled to half of the

---

[5] In fact, on cross-examination when defendant's attorney questioned plaintiff to identify what portions of the credit card debt was actually marital debt, plaintiff stated:

> Well there's nothing specifically here that says, you know, borrowed to pay marital debt, but there's about $70,000 in credit cards which are—were borrowed, you know, during the marriage and I continued to make those payments every month.... And I guess the only other thing would be marital debt would be the money that I borrowed to give to my wife to pay the mortgage which she didn't pay.

As noted earlier, the court-ordered payments to defendant were clearly insufficient to pay the mortgage, except possibly to the extent of the $14,000 she saved by substantially reducing her standard of living.

repayment of the $91,000 note, but refused to order its distribution because it was offset by defendant's responsibility for half the taxes. We can understand defendant's responsibility for some portion of the taxes, but the fifty percent assessment appears unreasonable. There is no question that defendant did not receive the benefit of one-half of plaintiff's income during this period. Thus we see no basis for her being required to pay one-half of the taxes, otherwise she would be required to pay a substantial portion of the taxes on the income that plaintiff alone enjoyed. On remand, the court should establish a ratio based upon defendant's participation in plaintiff's income, and only that portion of the taxes should be assessed to her.

### VIII.

The judgment of divorce is reversed in part and affirmed in part as stated in this opinion. The matter is remanded for reconsideration on the various points noted herein. Because there may be some brief additional discovery required, and because of our recognition of the scheduling difficulties, we request the trial judge to set this matter down for an immediate hearing for the reconsideration of pendente lite alimony and child support and for an order directing any payments to defendant that can be adequately assessed prior to the plenary hearing. We do not retain jurisdiction.