**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4518-16T3

MARYANN MAIKISCH,

     Plaintiff-Respondent,

v.

JOSEPH MAIKISCH,

     Defendant-Appellant.

_____

Argued October 1, 2018 – Decided October 25, 2018

Before Judges Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FM-19-0080-13.

Michael J. Hanifan, Sr., argued the cause for appellant (Law Office of Michael J. Hanifan, PA, attorneys; Michael J. Hanifan, Sr., on the briefs).

Peter J. Laemers argued the cause for respondent (Laemers Murphy & Neggia, LLC, attorneys; Mariann C. Murphy, on the brief).

PER CURIAM

In this post-judgment matrimonial case, defendant (ex-husband) appeals from the May 11, 2017 Family Part order awarding plaintiff (ex-wife) limited duration alimony for a period of ten years. Defendant argues the judge misinterpreted the parties' marital settlement agreement (MSA); erroneously awarded alimony to plaintiff despite finding that she was the "supporting spouse" during the marriage; determined the parties' marital lifestyle without properly factoring in the parties' accumulation of significant debt to support that lifestyle while married and the depletion of that source of income at the end of the marriage; failed "to consider the intent of the alimony statute" and "the controlling legal [principles]" governing alimony; and made factual findings that are not supported by "sufficient credible evidence" in the record. Based on our review of the record, we disagree and affirm.

We glean the following facts from the record. The parties were married in 1993. Two children were born of the marriage, a girl in 1999 and a boy in 2003. The parties divorced in 2013. Their Dual Judgment of Divorce incorporated a MSA, which included the following provision regarding alimony:

> [Defendant] represents that he is not as of the signing of this agreement employed. [Plaintiff] is currently waiving alimony from [defendant]. This waiver of alimony will continue for a period of five (5) calendar years. In the event that [defendant's] income exceeds [plaintiff's] income by twenty percent (20%) during any

2

year within this five (5) year period, [plaintiff] shall have the right to apply to the court for an award of alimony (either durational or permanent, as the court may decide).

Pursuant to the MSA, the parties also agreed to "an equal shared parenting plan . . . ." In executing the MSA, both parties confirmed that they were represented by counsel and warranted that they were "freely and voluntarily" signing the MSA "without duress" or coercion. They acknowledged having a full understanding of the legal consequences of the terms and provisions contained in the MSA and that the provisions were "fair, adequate and satisfactory as to each of them[.]"

Relying on the alimony provision of the MSA, on May 19, 2015, plaintiff filed a motion seeking alimony. The parties stipulated that the pre-conditions contained in the MSA were met by virtue of the fact that in 2014, less than five years after the divorce, defendant was hired by Atlantic Health Systems and earned $114,000 annually, which exceeded plaintiff's income by more than twenty percent. However, defendant asserted that while plaintiff had "met the threshold . . . to seek alimony[,]" the court was obligated to determine whether she had "a right to alimony" because "[t]here was no [marital] lifestyle agreed upon" by the parties. In response, Judge Michael Paul Wright agreed that the "threshold" for plaintiff to seek alimony "ha[d] been hurdled by the plain

3

language of [the MSA]." The judge continued that in the absence of any showing that the MSA was "inequitable or unconscionable," its alimony provision would be "enforced." Thus, the judge indicated he would "hear testimony" and determine "how much alimony" should be awarded, if any, and "what duration."

Thereafter, the judge conducted a multi-day plenary hearing over non-consecutive days, during which both parties testified about their respective educational backgrounds, employment and earnings history as well as their lifestyle both during and after the marriage. Plaintiff, then fifty-years-old, had a bachelor's degree in sociology. She testified that in 2003, she earned $67,000 annually as the Director of Volunteers and Patient Relations at Englewood Hospital. However, after the birth of their second child, she quit her job and became "a stay-at-home mom" at defendant's request. She re-joined the workforce in 2006, earning $40,000 annually as a secretary with the American Red Cross. She admitted that from 2008 to 2012, defendant made considerably less than she did, experiencing intermittent periods of unemployment and underemployment. She agreed that of the $235,185 earned by the parties during that timeframe, she significantly out-earned defendant.

4

Nonetheless, plaintiff described the parties' marital lifestyle as "upper middle class." According to plaintiff, from 2003 until she filed for divorce in 2012, the parties lived in a three-bedroom home on about an acre of land. The home had a deck, hot tub and finished basement. From 2009 until the divorce filing, they went on vacation every year, took cruises, and made "frequent weekend trips to Maine . . . [and] Rhode Island." The family golfed together, "went out to dinner . . . several times a week[,]" ordered clothing from upscale stores, and drove luxury cars. They even funded defendant's "political campaign" when "[h]e ran for freeholder." Plaintiff testified that the parties used a $200,000 home equity line of credit (HELOC) from 2005 to 2012 to support their lifestyle, which she characterized as "a lifestyle that was above their means."

According to plaintiff, her current lifestyle was significantly diminished. Although plaintiff currently earned $64,400 annually, she resided in a rented one-bedroom condo that required her to sleep on a pull-out couch when her children stayed with her. Her vacation trips were minimal and at her parents' expense and her entertainment consisted of visiting family members' homes. She no longer had cable or played golf, drove a leased Hyundai Sonata and struggled every year to afford Christmas and birthday gifts for the children. She

bought food at "a food bank" on a couple of occasions, rarely ate out at restaurants, and now shopped for clothing at Kohls and Walmart. Although she started a 401(k) with her employer, she had only saved a couple thousand dollars to date and had no other savings, pensions or assets.

Contrary to plaintiff's testimony, defendant believed the parties' marital lifestyle prior to the divorce was much less affluent than plaintiff described. Defendant, then fifty-three-years old, was a high school graduate, attended HVAC school, and had licenses in a variety of areas, including a boiler operator's license, a real estate license, and a license to sell life insurance and investments. According to defendant, in 2005, when he was laid off from Home Delivery America where he earned about $90,000 annually, he used the HELOC to supplement his income and accrued $120,000 in credit card debt[1] to maintain their lifestyle. Although he acknowledged that the family made frequent out-of-state trips, he testified that they had only taken two cruises, rather than three as plaintiff had testified, and denied frequenting restaurants as plaintiff had claimed. Defendant also denied asking plaintiff to leave her job after their second child was born and indicated that he wanted her to return to work.

---

[1] The credit card debt was discharged when the parties jointly filed a bankruptcy petition in 2013.

A-4518-16T3

Following the hearing, on May 11, 2017, Judge Wright entered an order awarding plaintiff alimony in the amount of $299 per week for a period of ten years, retroactive to the date of plaintiff's motion. In his written statement of reasons spanning fifteen pages, the judge meticulously detailed his findings of fact and conclusions of law. In determining the amount and type of alimony, the judge methodically and thoroughly addressed all the applicable factors set forth in N.J.S.A. 2A:34-23(b),[2] and considered the parties' case information

---

[2] These factors include:

(1) The actual need and ability of the parties to pay;

(2) The duration of the marriage or civil union;

(3) The age, physical and emotional health of the parties;

(4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living, with neither party having a greater entitlement to that standard of living than the other;

(5) The earning capacities, educational levels, vocational skills, and employability of the parties;

(6) The length of absence from the job market of the party seeking maintenance;

(7) The parental responsibilities for the children;

A-4518-16T3

statements (CIS) as well as their testimony about their lifestyle, earnings and financial needs.

---

(8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment;

(13) The nature, amount, and length of pendente lite support paid, if any; and

(14) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23(b).]

8

Judge Wright considered the divergence in the parties' characterization of their marital lifestyle as well as the HELOC and credit card debt utilized to support the lifestyle. The judge noted that "[t]he proofs [were] uncontroverted that the previous marital lifestyle was a sham" and that "[n]either party could afford the lifestyle they maintained" as it "was funded on debt[.]" The judge considered the parties' employment and earning histories, including the fact that defendant "ha[d] recently become unemployed." However, the judge noted that "temporary unemployment [was] less relevant to the [c]ourt's analysis than . . . [d]efendant's immediate past ability to earn a specific salary." Further, the judge utilized defendant's earning ability to calculate his alimony obligation rather than the "sham" marital lifestyle because "[u]sing the prior marital lifestyle to calculate alimony [would be] misleading."

The judge also considered the conflicting testimony about "which party insisted on [plaintiff's] absence from the workforce" after the birth of their second child. The judge explained that the "distinction [was] immaterial," "given the fact that the absence was for a relatively short period of time," and "[p]laintiff reentered the work force approximately ten (10) years ago" without any apparent adverse impact on "her earnings." Judge Wright acknowledged that plaintiff "historically earned more income during the [twenty-year]

marriage" and "was the supporting spouse for several years near the end of the marriage." However, according to the judge,

> [T]he provision of the MSA which gives rise to the award of alimony clearly indicates that the parties envisioned [d]efendant's earning capacity to be higher than [p]laintiff[']s. Thus, an award of alimony is appropriate despite the fact [p]laintiff was the supporting spouse for a period of time. In all, however, permanent alimony is not appropriate for a spouse that may now need support but at one time was the "breadwinner."

Noting that "the clear intent of the MSA" was for defendant to pay plaintiff alimony "should his income exceed hers by 20%" and "that [d]efendant was on pace to earn approximately $123,000 . . . as compared to [p]laintiff's $63,000" annual salary, the judge reasoned:

> Given the income differential, [p]laintiff is entitled to an award that will allow her to live a lifestyle at least somewhat comparable to [the lifestyle] that she knew during the marriage. That lifestyle may have been a sham middle to upper middle[-]class living but it was the lifestyle nonetheless. This is especially true where [d]efendant/obligor alone has the funds to live above that of the marital lifestyle based upon the recent income capacity he has demonstrated. However, the [c]ourt is wary of the former marital standard of living because that was funded on debt and the term of alimony must take into consideration all the above factors. The [c]ourt finds that the parties['] ages are particularly relevant in this regard. The parties are nearing retirement age. Permanent alimony would not be appropriate given the fact that [d]efendant is also

10

entitled to have his obligation established such that he may reasonably prepare for retirement. Plaintiff, although recently contributing toward her retirement account[s], must not be made to choose between affording a residence in which she does not have to sleep on the couch when her children visit, and contribution toward her own retirement funds.

Judge Wright concluded that the award would "hopefully accomplish the goal of the MSA and allow [p]laintiff to live a lifestyle reasonably comparable to the marital lifestyle without unduly burdening [d]efendant's right to that same lifestyle[,]" and "aid [p]laintiff in finding more suitable housing accommodations . . . to house herself and the children simultaneously when they visit with her - which [was] half the time." This appeal followed.

The scope of our review of a Family Part order is limited. We accord substantial deference to the Family Part because of that court's special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998). Thus, while we owe no special deference to the trial judge's legal conclusions, Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995), we

"should not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice" or when we determine the court has palpably abused its discretion.

11

[Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412).]

We will only reverse the judge's decision when it is necessary to "'ensure that there is not a denial of justice' because the family court's 'conclusions are [] 'clearly mistaken' or 'wide of the mark.'"  Id. at 48 (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

This standard applies equally to the Family Part's decisions regarding alimony.  In awarding alimony, the judge must consider the thirteen factors enumerated in N.J.S.A. 2A:34-23(b), along with any other factors deemed relevant.  "[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage."  Crews v. Crews, 164 N.J. 11, 16 (2000).  It is "critical" and "essential" to "[i]dentify[] the marital standard of living at the time of the original divorce decree . . . regardless of whether the original support award was entered as part of a consensual agreement or of a contested divorce judgment."  Id. at 25.

"The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income."  Hughes v. Hughes, 311 N.J. Super. 15, 34 (App. Div. 1998).  In determining the marital standard of living or lifestyle, the

A-4518-16T3

trial court looks at various elements including "the marital residence, vacation home, cars owned or leased, typical travel and vacations each year, schools, special lessons, and camps for [the] children, entertainment (such as theater, concerts, dining out), household help, and other personal services." Weishaus v. Weishaus, 360 N.J. Super. 281, 290-91 (App. Div. 2003), rev'd in part on other grounds, 180 N.J. 131 (2004). In making the determination, the court should also consider the payor's earnings and ability to support the payee, see Crews, 164 N.J. at 27, because the ultimate determination must be based not only on the amounts expended, but also what is equitable. Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004).

Oftentimes, as here, MSAs impact the trial judge's alimony award. In interpreting MSAs, although the law "vests 'judges greater discretion when interpreting such agreements[,]'" Quinn v. Quinn, 225 N.J. 34, 45-46 (2016), "courts should discern and implement the intentions of the parties" and not "rewrite or revise an agreement when the intent of the parties is clear." Id. at 45. "Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result[,]" ibid., or there is a "need to reform a settlement

agreement due to 'unconscionability, fraud, or overreaching in the negotiations of the settlement.'" Id. at 47 (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)).

We will not disturb an alimony award on appeal if the trial judge's conclusions are consistent with the law and not "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Foust v. Glaser, 340 N.J. Super. 312, 316 (App. Div. 2001). The question is whether the trial judge's factual findings are supported by "adequate, substantial, credible evidence" in the record and whether the judge's conclusions are in accordance with the governing principles. Ibid.; accord Gnall v. Gnall, 222 N.J. 414, 428 (2015). Applying these principles, contrary to defendant's arguments, the judge's alimony award reveals nothing "so wide of the mark" that we could reasonably conclude a clear mistake was made. Rather, we are satisfied that Judge Wright's factual findings are supported by adequate, substantial and credible evidence in the record and that his legal conclusions are unassailable. Accordingly, we affirm substantially for the reasons set forth in his comprehensive statement of reasons.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4518-16T3