NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1278-18T3

S.W.,

     Plaintiff-Respondent,

v.

G.M.[1],

     Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

February 24, 2020

APPELLATE DIVISION

Argued January 29, 2020 — Decided February 24, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FM-20-2163-11.

Brian G. Paul argued the cause for appellant (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Brian G. Paul, of counsel and on the briefs).

Jeffrey P. Weinstein argued the cause for respondent (Weinstein Lindemann & Weinstein, attorneys; Jeffrey P. Weinstein, of counsel and on the brief; Rachel Zakarin, on the brief).

     The opinion of the court was delivered by

---

[1] We use initials to protect the parties' privacy interests.  See R. 1:38-3(d).

MAWLA, J.A.D.

This matter returns after we reversed and remanded portions of a final judgment of divorce, directing the trial judge "to articulate, numerically, his findings regarding the marital lifestyle" for alimony purposes. S.W. v. G.W., No. A-4063-14 (App. Div. Feb. 20, 2018) (slip op. at 39). We also stated "[t]o the extent the determination upon remand necessitates a review of the life insurance award, the trial judge should also adjust the insurance amount plaintiff [S.W.] is required to maintain, if appropriate." Id. at 47.

Following the remand, the trial judge considered written submissions from the parties and entered an August 27, 2018 order amending the judgment of divorce, increasing defendant G.W.'s alimony without enumerating the marital lifestyle. On November 9, 2018, the judge denied defendant's motion for reconsideration and reduced the life insurance amount he previously found appropriate to secure plaintiff's alimony obligation. Defendant appeals from both orders. Because the judge did not numerically calculate the marital lifestyle, we reverse and remand.

We set forth the facts adduced at trial in greater detail in our prior decision. To summarize, the parties were in a long-term marriage, which produced three children, all of whom are emancipated. Both parties are college educated. Defendant ceased her employment decades ago following

the birth of the parties' first child. Plaintiff was the sole breadwinner as a Senior Managing Director of a boutique restructuring firm, Zolfo Cooper (ZC).

Plaintiff's aggregate compensation was capped at $2,000,000 per year. His income ebbed and flowed with ZC's fortunes, exceeding the cap in several years and declining far below it in others. We found no abuse of discretion and upheld the trial judge's calculation of plaintiff's net income at $1,313,000 per year by averaging the five years of earnings prior to the complaint.[2]

We also upheld the trial judge's description of the parties' lifestyle recounting the following:

> The parties lived a wealthy lifestyle and did not save. At the time of trial, the parties had no retirement accounts because [they] had been liquidated to fund the marital lifestyle. The parties purchased a marital residence in 1986 and a residence on Cape Cod in 1998. According to the testimony, the judge concluded both residences "were renovated and enlarged on an almost constant basis." The improvements were financed through mortgage re-financing of both homes.
>
> The parties owned twelve boats during the marriage including sailboats and three Boston Whalers. Plaintiff's Case Information Statement (CIS) nearest the date of complaint set forth monthly expenses of $80,853 and defendant's CIS indicated

---

[2] Contrary to defendant's assertion on this appeal, our conclusion that the trial judge did not abuse his discretion in averaging plaintiff's income was not a declaration the income determination was immune to modification or a change in circumstances. Neither we nor the trial judge made such a statement.

those expenses were $92,147 per month. The parties' children attended private schools, including exclusive boarding schools for high school. The children's educational and activity fees and expenses were funded by plaintiff's income and student loans. The family enjoyed the benefits of country club, dinner club, and yacht club memberships. Plaintiff's CIS articulated a family vacation budget of $60,000 and defendant $150,000 per year. Defendant spent $100,000 per year on a photography hobby.

Even though defendant estimated the family spent between $1,000,000 and $1,500,000 annually, defendant maintained plaintiff had secreted funds from the marriage. The trial judge concluded defendant had not proved a dissipation because she had admitted all of plaintiff's income was used to pay the marital expenses. The judge found "[t]he overwhelming evidence is that these parties both lived an incredibly profligate lifestyle as evidenced by both parties['] [CISs]. . . . In short, it was a budget without any apparent restraints."

[S.W., No. A-4063-14 (slip op. at 5-6).]

We recited the trial judge's reasoning for awarding alimony:

The trial judge awarded defendant permanent alimony utilizing the version of N.J.S.A. 2A:34-23(b) that existed before its amendment in September 2014. . . .

The judge determined permanent alimony was supported by the majority of the statutory factors. He concluded the marriage was of an "extremely long duration" and "the parties lived a relatively opulent, and certainly an upper income lifestyle. Their lifestyle consumed the entirety of [plaintiff's] income." He found:

4

the goal of "maintaining the lifestyle" is more of a goal than a reality. In the case of [defendant,] her most recent CIS shows that her lifestyle has decreased from $92,352 to $27,042 per month. Without even beginning to analyze these figures for credibility purposes, it is clear that she has had to "sacrifice" her prior lifestyle during the course of this litigation, and will have to do so going forward.

The judge found plaintiff's ability to maintain the lifestyle going forward was facilitated by "an extremely generous expense account." Thus, the judge found plaintiff would "have more flexibility" in maintaining the lifestyle than defendant who would be dependent on alimony alone. Conversely, the judge found the equitable distribution award supported the alimony amount awarded because defendant would receive at least $750,000 from her share of ZC to invest "while [plaintiff] will likely someday have the ability to be bought out upon retirement."

The judge found defendant could earn no money because she had been "out of the workforce for decades." The judge found that plaintiff and his partners had reduced their draw from $850,000 to $450,000 per year each. He determined plaintiff's income fluctuated dramatically because the "bonus can vary relatively wildly." However, the judge determined there was never a year where plaintiff's income fell below $1,000,000.

The judge ordered the alimony payable at a rate of $22,000 per month from plaintiff's draw and $186,000 per year payable from the bonus for a total yearly obligation of $450,000. The judge made alimony taxable to defendant and tax deductible to plaintiff. The judge ordered plaintiff to maintain life

5

insurance of $4,000,000 to secure his alimony obligation.

[S.W., No. A-4063-14 (slip op. at 18-20).]

We reversed the alimony determination and, as related to the issues now raised on this appeal, stated:

> Although the judge's descriptive findings regarding the lifestyle were adequate, we are unable to correlate his findings regarding the parties' expenditures with the alimony award. Indeed, the judge ordered plaintiff to pay defendant permanent alimony of $450,000 per year based on an income of $1,313,000, but without a numerical finding of lifestyle, we are unable to determine how the alimony figure was derived. For these reasons, we reverse the alimony award and remand for the trial judge to make a numerical finding of the marital lifestyle and then explain whether and how the alimony award meets it.
>
> [S.W., No. A-4063-14 (slip op. at 40-41).]

In the August 27, 2018 order, the trial judge increased alimony to $36,792 per month, and credited defendant's pendente lite support based on the increase. In his November 9, 2018 order the judge reduced plaintiff's life insurance obligation from $4 million to $2.2 million.

As to alimony the judge reasoned as follows:

> [Defendant] testified that the marital lifestyle was approximately $700,000 at one time, and then later went to range from one million to one and a half million dollars. Defendant's CIS[] dated September 1, 2011[,] claimed monthly expenditures of $92,147, which, according to her, had only decreased to

$90,142 after separation. In contrast, [p]laintiff's CIS, filed with the court on January 8, 2013, indicated marital lifestyle of $80,853, and post-separation expenses for him of $63,540. However, this latter number included pendente lite support as well as considerable expenses for the children. Moreover, [plaintiff] complained that the pre-separation lifestyle number was inflated by [defendant] "overspend(ing) on extravagancies", giving an example of her spending $120,000 on a photography habit.

By 2014, the number submitted by the parties had changed significantly. Defendant's CIS, as submitted on May 23, 2014, indicated a monthly lifestyle amount of $27,042. Plaintiff's CIS, as filed with the court on May 21, 2014, indicated an amount of $57,579, including the then current pendente lite support amount of $22,000, as well as $12,500 for the children's school costs. Taking away these two amounts would represent a current lifestyle for [plaintiff], as of the time of filing, of approximately $23,000. However, as previously noted, at the time of this court's initial decision, [plaintiff's] lifestyle was supported by his expense account at [ZC].

The court, in reviewing [d]efendant's final CIS prior to trial, finds same to be credible. The court is also satisfied that the expenditures contained therein do not represent true numbers of the lifestyle enjoyed during the marriage. That is not to say that the court accepts [p]laintiff's argument that the court can assign a number that represents the actual lifestyle during the marriage. As the court has previously found, the parties lived a lifestyle which completely subsumed [plaintiff's] income. There is simply no way to return both parties to that exorbitant lifestyle. However, [defendant's] CIS omits numerous spending categories that should be accounted for to achieve a lifestyle somewhat commensurate with the marital lifestyle.

A-1278-18T3

At this point, the judge added back to defendant's current lifestyle budget amounts representing some CIS schedule B and C line item expenses he determined were reasonable to include in her budget. We do not repeat this aspect of the findings because the judge's starting point was defendant's current budget, as opposed to the marital lifestyle. At the conclusion of the exercise, the judge stated "[b]ased upon the foregoing, the court determines defendant's actual monthly need is $36,792."

On reconsideration, the judge reiterated his reasoning regarding the alimony and did not elaborate further on the issue of marital lifestyle. Regarding life insurance, relying on plaintiff's certification, which defendant disputed, the judge explained his reasoning as follows:

> And, finally, there's this issue of the . . . insurance necessary. Of course, the insurance is necessary as a surety against the payment of the alimony. [A]pparently [plaintiff] has a three-million dollar policy, I'm told in the papers. And the argument is that at least . . . [$]2.2 million should be guaranteed to [defendant] going forward, and that is based on the alimony amount that the [c]ourt has calculated spread over a five-year term.
>
> At which point he will presumably, at least potentially, reach an age of good faith retirement. That . . . argument does resonate with the [c]ourt. I did omit it from my decision, so I will order that $2.2 million be the surety amount through life insurance . . . to protect [defendant's] interests . . . .

## I.

In reviewing an alimony award, we typically defer to the trial judge's findings and reverse only where there is an abuse of discretion.  See Overbay v. Overbay, 376 N.J. Super. 99, 106 (App. Div. 2005).  We likewise review the denial of reconsideration for an abuse of discretion.  Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996).  However, where the issue is a mistake of law, our review is de novo.  S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Defendant argues the trial judge set alimony based on her pendente lite budget, which was far below the marital lifestyle.  She argues the judge disregarded our instructions to find the numerical lifestyle and explain whether, and how, the alimony met it.  Defendant argues the judge should have used the budget for the intact family and then set a post-divorce budget for her. She also asserts the Mallamo[3] credit was erroneous due to the improper lifestyle analysis.  She argues the judge reduced the life insurance death benefit for alimony by improperly speculating plaintiff would retire at the full social security age.  Defendant urges we exercise original jurisdiction to finally decide these issues.

---

[3]  Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995).

A-1278-18T3

## II.

The importance of finding the marital lifestyle cannot be overstated. It is at once the fixed foundation upon which alimony is first calculated and the fulcrum by which it may be adjusted when there are changed circumstances in the years following the initial award.

> Alimony is an "economic right that arises out of the marital relationship and provides the dependent spouse with 'a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage.'" Mani v. Mani, 183 N.J. 70, 80 (2005) (quoting Stiffler v. Stiffler, 304 N.J. Super. 96, 99 (Ch. Div. 1997)). . . . "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation." Innes v. Innes, 117 N.J. 496, 503 (1990) (citing Mahoney v. Mahoney, 91 N.J. 488, 501-02 (1982)).
>
> [Quinn v. Quinn, 225 N.J. 34, 48 (2016).]

The goal in fixing an alimony award "is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). "The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, . . . [or] limited themselves to their earned income," Glass v. Glass, 366 N.J. Super. 357, 371 (quoting Hughes v. Hughes, 311 N.J. Super. 15, 34 (App. Div.

1998)), or if they chose to accumulate savings. <u>Lombardi v. Lombardi</u>, 447 N.J. Super. 26, 36-37 (App. Div. 2016).

> In contested divorce actions, once a finding is made concerning the standard of living enjoyed by the parties during the marriage, the court should review the adequacy and reasonableness of the support award against this finding. That must be done even in situations of reduced circumstances, when the one spouse's income, or both spouses' incomes in combination, do not permit the divorcing couple to live in separate households in a lifestyle reasonably comparable to the one they enjoyed while living together during the marriage.
>
> [<u>Crews</u>, 164 N.J. at 26.]

In <u>Hughes</u>, the parties spent more than they earned and relied on borrowing and parental support to meet the marital lifestyle. 311 N.J. Super. at 34. The trial judge discounted these additional funds and determined the lifestyle using only the family's earned income, which the judge termed the "real" standard of living. <u>Ibid.</u> We held "[t]he judge . . . confused two concepts. The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income." <u>Ibid.</u>

In many cases, parties live above their means or spend their earnings and assets to meet expenses. In such instances, a finding of the marital lifestyle must consider what the parties spent during the marriage and not merely offer

11

a nod to a bygone, unattainable lifestyle. In this case, the trial judge overlooked the lessons from <u>Crews</u> and <u>Hughes</u> and our instruction to find, numerically, the marital lifestyle. To the extent <u>Crews</u> and <u>Hughes</u> implicitly required that marital lifestyle be determined numerically, we now explicitly state a finding of marital lifestyle must be made by explaining the characteristics of the lifestyle and quantifying it.

In a contested case, a trial judge may calculate the marital lifestyle utilizing the testimony, the CISs required by <u>Rule</u> 5:5-2, expert analysis, if it is available, and other evidence in the record. The judge is free to accept or reject any portion of the marital lifestyle presented by a party or an expert, or calculate the lifestyle utilizing any combination of the presentations.

Here, the trial judge disregarded the marital budget altogether and instead supplemented defendant's current budget with some expenses she once enjoyed during the marriage. This methodology is problematic because it ignored the judge's own findings that the marital lifestyle "subsumed" the entirety of plaintiff's earnings. By application of this logic, if the judge determined the net yearly income was $1,520,268[4] or $126,689 per month, the

---

[4] On remand, the trial judge adjusted his finding of the net yearly income from $1,313,000 to $1,520,270. Notably, the record reflects expenditures near the adjusted income figure. In evidence was a marital lifestyle analysis plaintiff commissioned, reflecting expenditures of $1,600,104.

alimony award allotted defendant disposable income of $36,792[5] and plaintiff $89,897 per month without explanation. This was a misapplication of law because it ignored <u>Crews</u> and N.J.S.A. 2A:34-23(b)(4), which requires a judge consider "[t]he standard of living established in the marriage . . . and the likelihood that each party can maintain a reasonably comparable standard of living, with neither party having a greater entitlement to that standard of living than the other."

To be clear, N.J.S.A. 2A:34-23(b)(4) does not signal the Legislature intended income equalization or a formulaic application in alimony cases, even where the parties spent the entirety of their income. Had the Legislature intended alimony be calculated through use of a formula, there would be no need for the statutory requirement that the trial court address all the statutory factors. The Legislature declined to adopt a formulaic approach to the calculation of alimony. <u>See</u> Assemb. 845, 216th Leg., 2014 Sess. (N.J. 2014) (declining to enact legislation computing the duration of alimony based upon a set percentage).

---

[5] This figure excluded substantial expense line items enjoyed during the marriage according to both parties' CISs, namely, a second home, boats, and domestic help. Indeed, plaintiff's CIS nearest the trial date reflected a marital lifestyle of $946,548 and defendant's CIS reflected $1,109,988 per year.

The portion of the marital budget attributable to a party is likewise not subject to a formula. Contained in most marital budgets are expenses, which may not be associated with either the alimony payor or payee, including those associated with children who have since emancipated or whose expenses are met by an asset or a third-party source having no bearing on alimony. There are also circumstances where an expense is unrelated to either the payor or the payee but is met by that party on behalf of a child. And, as is the case here with defendant's photography hobby, there are expenses which only one party incurred during the marriage. Therefore, after finding the marital lifestyle, a judge must attribute the expenses that pertain to the supported spouse. Only then may the judge consider the supported spouse's ability to contribute to his or her own expenses and the amount of alimony necessary to meet the uncovered sum. Crews, 164 N.J. at 32-33.

For these reasons, we again reverse and remand the alimony computation and direct the judge to numerically determine the marital lifestyle and apportion it. Because we have remanded the alimony computation, we do not address the Mallamo credits, as they too will be adjusted based on the new alimony award.

### III.

The reversal of the alimony award also requires that we reverse and remand the life insurance determination for reconsideration. The judge relied on N.J.S.A. 2A:34-23(j)(1), which states: "There shall be a rebuttable presumption that alimony shall terminate upon the obligor spouse or partner attaining full retirement age." The judge determined the $2.2 million coverage amount by multiplying the alimony by five years, at which point plaintiff would reach the full social security age.

A determination of the proper amount of life insurance coverage for a support obligation requires a consideration of many variables. Where a party is insurable and able to pay the necessary premiums, a life insurance death benefit should neither only meet a beneficiary's bare needs, nor be a windfall. In the former case, unexpected changes in circumstances can leave a beneficiary with unmet needs, whereas the latter condition exposes a payor's estate to obligations he or she never had during the marriage.

In the alimony context, "once the amount of the obligation is established, the present value (or more correctly, the continuing present value as the obligation decreases) should be determined." Lawrence J. Cutler & Robert J. Durst, Life Insurance As a Security Vehicle In Dissolution Cases, 12 J. Am. Acad. Matrim. Law 155, 161 (1994). Online present value calculators simplify

the ability to perform this calculation. See, e.g., MSN, Present Value, Microsoft News, https://www.msn.com/en-us/money/tools/timevalueofmoney/.

The present-day value methodology is appropriate where there is a "known future quantity" of an obligation. Ibid. Where the alimony obligation is not readily quantifiable because the duration of the obligation is unknown, a trial judge may utilize an obligor's life expectancy to determine the duration of the obligation if it is reasonable to do so. Life Expectancies for All Races & Both Sexes, Pressler & Verniero, Current N.J. Court Rules, Appendix I-A, www.gannlaw.com.

Additionally, a reduction in the amount of security as the obligation is satisfied is an appropriate means of assuring alimony is secured but not subject to a windfall. See Claffey v. Claffey, 360 N.J. Super. 240, 264-65 (App. Div. 2003) (stating "it is perfectly reasonable to provide for the periodic reduction or review of the amount of . . . required security to reflect the diminishing need for it as the parties age, or circumstances otherwise change."); see also Lawrence J. Cutler & Robert J. Durst, Life Insurance As a Security Vehicle In Dissolution Cases, 12 J. Am. Acad. Matrim. Law at 161 (endorsing a declining death benefit). In some cases, where the obligation has the potential to extend beyond an assumed end date because of a change in circumstances, or where a

16

presumption of termination has been rebutted, it may be appropriate to decrease the death benefit in smaller increments or not at all.

In alimony contexts, determining whether to use life expectancy or the presumptive retirement age, and a fixed or declining amount of security will depend on the circumstances of each case and is a matter of judicial discretion. Here, there was no testimony, and only a disputed assertion regarding plaintiff's potential retirement at the full social security age. Additionally, because the alimony award is of an open duration and may not necessarily terminate when plaintiff reaches the full social security age, the methodology we have set forth will provide the trial judge with enough flexibility to determine the extent and amount of life insurance needed.

IV.

Finally, we decline to exercise original jurisdiction to adjudicate this appeal. We "may exercise . . . original jurisdiction as is necessary to the complete determination of any matter on review." R. 2:10-5. "In determining whether to exercise original jurisdiction, an appellate court not only must weigh considerations of efficiency and the public interest that militate in favor of bringing a dispute to a conclusion, but also must evaluate whether the record is adequate to permit the court to conduct its review." Price v. Himeji, LLC, 214 N.J. 263, 295 (2013). "Despite the utility of the original-jurisdiction

authority, it is clear that resort thereto by the appellate court is ordinarily inappropriate when fact-finding or further fact-finding is necessary in order to resolve the matter." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 2:10-5 (2020) (citing Price, 214 N.J. at 294-95).

The trial judge should resolve the remaining disputes because having heard the case and considered the testimony he has a "feel of the case." Cesare v. Cesare, 154 N.J. 394, 411-13 (1998). Further testimony may or may not be required to complete the remand. We are confident the trial judge will adjudicate the remaining issues fairly and the matter should be left to him.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION