**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2754-22

JASON LEVENTHAL,

    Plaintiff-Appellant,

v.

LORI ANNE DI PAOLO-
LEVENTHAL,

    Defendant-Respondent.

_____

Argued February 6, 2025 – Decided February 13, 2025

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-0624-20.

Bonnie C. Frost argued the cause for appellant (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Bonnie C. Frost, Matheu D. Nunn, and Jessie M. Mills, on the briefs).

Kristin S. Pallonetti argued the cause for respondent (Law Office of Steven P. Monaghan, LLC, attorneys; Kristin S. Pallonetti, on the brief).

PER CURIAM

Plaintiff Jason Leventhal appeals from a March 29, 2023 final judgment of divorce entered following a seven-day trial involving his former spouse, defendant Lori Anne Di Paolo.[1]  He also appeals from a post-judgment order dated May 16, 2023, and two orders dated July 7, 2023.  We affirm.

Both parties and their joint forensic accountant testified at trial, after which the trial judge issued a detailed written opinion recounting the salient facts.  The parties were married for more than twenty-one years when plaintiff filed his complaint for divorce in December 2019.  They have two adult children, both of whom were in college during the divorce proceedings.  Each party was forty-nine years old when trial commenced.

Both parties are attorneys.  However, defendant practiced for less than one year before becoming pregnant and leaving her job to raise the children. Plaintiff began his career as a prosecutor, then worked for an insurance company, before opening his own firm with a partner in 2004, representing plaintiffs in Section 1983 actions for law enforcement misconduct.  Plaintiff's

---

[1]  The final judgment granted defendant the ability to resume her prior surname. We refer to her accordingly.

A-2754-22

partner had a referral source from a nationally recognized law firm, which generated business for the firm.

The parties lived an upper-middle class, affluent lifestyle. In 2012, they purchased a marital home in Colts Neck for $1.56 million with the help of a $330,000 loan from defendant's parents.

In 2015, plaintiff and his partner dissolved their firm. According to plaintiff, the dissolution occurred in part because their firm was small and only able to handle a large caseload because they "were kind of a settlement machine." However, around 2012, the defendants began "litigating almost everything" in their cases, which their firm was not "built for." As the firm dissolved, plaintiff split the remaining cases referred by the national law firm equally with his partner.

After fifteen years out of the workforce, defendant returned to work outside the marital residence in 2015. She worked full-time in medical billing for two medical offices.

Meanwhile, plaintiff opened his own law firm. The new firm handled local civil rights and Section 1983 cases involving: clergy abuse; products liability; Boy Scout abuse; and mass torts. Plaintiff testified that most of the income for his firm in 2015 through 2018 was from the cases generated by his

3

former partnership. He did not market for cases in 2019 because he could not afford it and his "personal expenses had gotten out of control."

Although the marital residence had a pool house on the property that plaintiff could reside in, he moved to a rented apartment in September 2019. Afterwards, he alleged to be living "paycheck to paycheck"; "did not have any savings"; and was "spending every dime that [he] earned."

Plaintiff resumed marketing his firm's services in 2020. He argued his income dropped because the income from the cases he had taken from his former partnership diminished, and the cases he generated did not make up the difference. However, plaintiff was co-counsel in a wrongful death case against New York City, which settled and resulted in a court-ordered legal fee totaling $835,000, half of which belonged to him. Rather than take his full one-half share, plaintiff and his co-counsel released $400,000, which they split equally. He claimed there was still litigation occurring in the New York surrogate court because the decedent's relatives were disputing the distribution of the settlement proceeds. Plaintiff and co-counsel felt they could not apportion the fees until the surrogate case was concluded because they did not know how much more work was necessary to resolve it.

4

Plaintiff described the marital standard of living as "[h]igh." His case information statement (CIS) filed at the time of the complaint projected a joint marital lifestyle of $11,938 per month. Defendant described the lifestyle as "a very high standard of living[,]" and her CIS nearest the date of complaint projected a joint marital lifestyle of $24,552 per month. The parties drove "nice cars," and the children attended private high schools and colleges. There were family vacations in the summer and winter.

The marital lifestyle was also characterized by debt. Although there was no credit card debt, they had a mortgage and a home equity line of credit (HELOC), which they used to fix the marital residence and fund the marital expenses. At some point in 2020, plaintiff fell behind on the mortgage and HELOC. The parties also owed the IRS over $100,000 for unpaid taxes for 2014 through 2016. Plaintiff claimed the marital expenses prevented him from paying the taxes.

In May 2020, the parties entered a consent order pursuant to which plaintiff took a $75,000 distribution from a marital retirement account to pay for various expenses. The consent order required him to repay the distribution by December 31, 2020. Plaintiff failed to do so.

A-2754-22

The marital residence eventually sold for $1,415,000 in October 2020. The parties realized only $46,000 in proceeds, which went to pay their legal fees. Each party blamed the other for the delay in selling the property.

Following the sale of the marital residence, plaintiff paid defendant $6,000 per month from October 2020, when the marital home sold, until the trial judge entered a pendente lite support order in June 2021. Prior to the entry of the pendente lite order, plaintiff unilaterally deducted money from the monthly support based on expenses he thought the parties should be sharing.

On June 23, 2021, the trial judge ordered plaintiff to pay defendant $5,500 per month in pendente lite spousal support and $1,000 per month in child support. At trial, plaintiff requested a Mallamo[2] credit against his pendente lite support, claiming his income was lower than the figure used by the judge.

Around August or September 2021, plaintiff and his co-counsel in the New York case released a second disbursement of $100,000, which they split equally. According to plaintiff, he did not take his total entitlement to the fees without co-counsel's permission because he could be disbarred.

In 2021, plaintiff began to generate more money from his own clients than generated by his former partnership. However, in November 2021, he used a

---

[2] Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995).

A-2754-22

line of credit to pay his own paycheck and business expenses for his firm. Plaintiff's former partner was still litigating four cases, which had the potential to generate income. He testified the judge should treat whatever fees he received from these cases as income. Defendant argued the judge should treat these fees as equitable distribution and divide them equally between the parties.

Plaintiff's firm had liabilities, including a $150,000 Economic Injury Disaster Loan (EIDL) awarded by the Small Business Association in 2020 during the COVID-19 pandemic. There was a legal malpractice lawsuit pending against him in New York and he owed his lawyer $25,000. The firm also owed a different attorney $22,000 for work regarding a sanctions motion filed against plaintiff.

Pursuant to the joint accountant's forensic valuation, the parties agreed the value of plaintiff's firm was $260,000. Plaintiff asserted defendant should receive approximately thirty percent of the value in equitable distribution.

During the marriage, the parties established 529 accounts for each child, which they funded through monthly contributions. Defendant testified her parents also had "started gifting the children larger amounts for certain holidays that were earmarked for their college funds." Her parents gave her checks totaling approximately $30,000 to deposit into the children's 529 accounts.

7

Defendant testified plaintiff managed all the parties' finances, including the 529s, and she trusted him to handle these issues. She later learned he never deposited the checks into the children's accounts.

Plaintiff testified the older son had approximately $3,000 in his account, and the younger son had $10,000. He withdrew $102,000 and $82,500 from the older and younger son's accounts, respectively, which he deposited into his personal account to pay for marital bills, including the "house, the kids' education, the kids' lifestyles, [and the parties'] lifestyles." He did not discuss the withdrawals with defendant. Defendant testified she did not know about the withdrawals and first learned about them when the older child was applying to college.

Plaintiff testified he maintained a relationship with the older child, who resided with each parent half of the time when he was not at school. Defendant claimed the child only spent about twenty-five percent of his time with plaintiff and the rest with her. The older child's freshman year at college was funded from his 529 account. Plaintiff then co-signed loans in the child's name of approximately $50,000 to $55,000 each year to pay his sophomore and junior year tuition. He never discussed the loan with defendant, but testified she should take out a loan to fund the senior year tuition.

8

The younger child was not speaking to plaintiff and resided with defendant when he was not at school. Defendant testified she took out a loan to pay for his college education. She asked plaintiff to help contribute to the child's computer, room, board, and tuition for 2022, but he refused. Plaintiff asserted he should not have to pay the younger child's college expenses until he agreed to attend reunification therapy with him.

Each party filed an updated CIS detailing their income and expenses. Plaintiff's CIS included expenses for himself and the older child, totaling $15,634 per month. Included in this figure was the $6,500 per month pendente lite support award. Plaintiff estimated his income for 2022 would be about $260,000. He paid himself $10,000 every two weeks using a line of credit.

Defendant's monthly expenses for herself and both children totaled $12,469 per month. She testified the sum was much less than the marital lifestyle and did not include a savings component. Defendant cut back on vacations, clothing, food, and restaurants to make ends meet.

Defendant testified her income from both of her jobs totaled $95,000, $92,956.50, $113,648, $96,278.22, $94,970.66, and $68,245.44 for 2016 through 2021, respectively. Although plaintiff alleged the drop in defendant's income in 2021 was intentional, defendant explained that many appointments

became telephonic after the pandemic, which in turn reduced overhead and foot traffic in the office, resulting in less work hours. One of the doctors she worked for retired, and the other reduced his hours. Her income also decreased because the children needed her. Defendant's law license was inactive, and she had not investigated other employment opportunities.

Defendant depleted her savings during the divorce to pay the IRS, counsel fees, and a loan from her parents. She also borrowed from her sister and mother to pay counsel fees and living expenses.

Defendant requested the trial judge award her open-durational alimony. Plaintiff argued the alimony amount should be based on a three-year average of his earnings from 2020-2022, which he estimated was approximately $275,000. He proposed to pay additional alimony if he received a settlement from one of his cases. Defendant opposed this methodology for alimony payments because plaintiff controlled: his cases; clients; the length of time in settling cases; and the money in his trust account and its disbursement, and she would never see the additional alimony.

Each party requested the court award them counsel fees. They alleged the other acted unreasonably and unnecessarily prolonged the litigation.

A-2754-22

The joint expert testified regarding the cash flow of plaintiff's law firm for 2017-2019, the period preceding and up to the date of complaint. He later updated his analysis to include the pendente lite years of 2020 and 2021.

The expert calculated the cash flow before and after taxes as follows:

| Year | Pre-Tax Cash Flow | Post-Tax Cash Flow |
|---|---|---|
| 2017 | $490,073 | $326,585 |
| 2018 | $503,096 | $334,711 |
| 2019 | $431,723 | $311,226 |
| | | |
| 2020 | $278,411 | $202,827 |
| 2021 (estimated) | $292,565 | $238,362 |
| 2017-2019 Average | $334,233 | $250,805 |
| 2017-2021 Average | $399,174 | $282,742 |

The analysis did not include the retirement account distributions. The 2021 figure was estimated because the tax returns for that year had not yet been filed.

The expert explained plaintiff received two Paycheck Protection Program (PPP) loans for $89,875 in 2020 and $282,852 in 2021, which were paid through payroll and ultimately forgiven. Plaintiff also took an EIDL of $150,000 in 2020, to pay the firm's expenses, including his salary and operating costs. The expert opined that if plaintiff had taken the entire amount of his portion of the settlement fees from the New York case of $417,500 in 2020, the three-year

11

average pre-tax cash flow would increase to approximately $380,000 per year and the five-year average pre-tax cash flow would be about $426,773 per year.

As part of the business valuation, the expert noted plaintiff did not spend any money on advertising in 2019 but spent $123,372 in 2020. Between 2016 and 2020, the practice had cash reserves of $18,373, $670, $17,748, $12,616, and $119,073, respectively.

The trial judge issued a written opinion with detailed findings regarding every aspect of the case. She found defendant was "very credible" and "[h]er testimony was also corroborated by the documentary evidence." Plaintiff was not credible. "[H]is testimony came across as scripted, rehearsed, and ingenuine. . . . [He] visibly shifted in his chair when he was uncomfortable with a question or when he was being less than forthright . . . ." Plaintiff was also disruptive while defendant testified, "constantly shaking his head, smirking, rolling his eyes or whispering under his breath. He also became exasperated and sometimes aggressive if he disagreed with the [c]ourt's ruling on an evidentiary issue." The expert was credible because he demonstrated knowledge of, and sophistication on, the valuation and cash flow issues. "He was intelligent, his testimony conveyed his extensive experience and he provided prompt, thorough[,] and easy to understand answers."

12

The trial judge accepted the expert's cash flow figures. She rejected plaintiff's arguments to use a three-year income average and that his income declined involuntarily due to the pandemic and loss of referrals from the national law firm in 2020 and 2021. The judge concluded accepting either argument would have resulted in a lower income calculation for purposes of alimony and child support. Although the pandemic had an impact on plaintiff's income, "it was temporary in nature. Further, the loss was mostly mitigated by large, forgivable . . . []PPP[] loans . . . ." There was no long-term impact on plaintiff's income, and he "concede[d] that he has been actively and successfully marketing for new cases and has brought in many new matters as a result of these efforts."

The judge observed the loss of referrals from the national law firm was not a factor because plaintiff's "income actually increased each year from 2015 through 2019. . . . It was only in 2020, which is conveniently the year after he filed for divorce, that his income decreased. The timing is highly suspect." There was no evidence presented to establish how much of plaintiff's income between 2015 and 2019 was derived from that referral source. Plaintiff demonstrated he had the ability to generate income despite loss of the referral source, as evidenced by the fact he was retained in many cases in 2020.

The trial judge also rejected the argument plaintiff had decreased earnings by noting he failed to include the fact he could have taken his whole share of the fees earned from the New York case but did not. "The entirety of the $835,000 fee could have immediately been divided and released . . . as the New York court had approved the fee and the[] collectible billable time exceeded $835,000." Contrary to plaintiff's claims, there was no impediment to the release of the money because New York law "makes it clear that approved attorney's fees are immediately payable upon the <u>filing</u> of a petition in the [s]urrogate's [c]ourt; release of attorney's fees is not contingent upon <u>resolution</u> of the [s]urrogate's [c]ourt matter—which could take years." Plaintiff "clearly had the authority to disperse the full $835,000 whenever he wished" since he had released $400,000 in October 2020, and another $100,000 in 2021. Even if plaintiff had "to expend additional time on the [s]urrogate matter, they are permitted to seek fees from the net estate funds. <u>Matter of Haag</u>, 43 N.Y.S.3d 870, 874 (Sur. Ct. Broome County 2016)."

The trial judge found the timing of the decision to leave a portion of the fee from the New York case in trust was suspect because after the filing of the divorce complaint plaintiff and his partner "suddenly entered into an informal letter agreement modifying their original agreement, whereby they agreed to

release only a fraction of the total fee." It was evident plaintiff's "actions were a tactical move designed to reduce his income during the pendency of the divorce, and nothing more."

Had plaintiff released the additional $235,000, his "pre-tax cash flow in 2020 would have been $495,000 ($278,411 + $217,500)—exactly on par with his earnings during the previous three years." This would have made his "five-year-average pre-tax cash flow . . . $432,673 and his three-year-average pre-tax cash flow would be $390,066."

It was "quite clear" to the judge plaintiff "deliberately manipulated his income in 2020 and 2021 to make it appear he was earning less" by leaving "much more cash in the business at the end of 2020 than in prior years." Plaintiff also "markedly increased his advertising expenses in 202[0]." Although the judge could appreciate marketing was a legitimate expense, the loss of the "referral source occurred in 2015. Yet, [plaintiff] spent nowhere close to what he spent in advertising fees in any year prior to 2020—after filing the divorce complaint."

"In short, the weight of the evidence show[ed] . . . plaintiff deliberately diminished his income after the filing of the divorce complaint to bolster his position in this divorce case." As a result, the judge concluded "it would be

grossly unfair to look only at [plaintiff's] three-year average income from 2019 through 2021, which includes two . . . years where the [c]ourt finds [plaintiff] was deliberately manipulating his income downward."  She imputed a pre-tax income to plaintiff of $425,000 per year.

The judge noted defendant's "five . . . year average pre-tax income was $93,219."  She considered the fact defendant was out of the workforce for sixteen years and "returned to work in October 2015, but not as an attorney." The judge found no evidence to corroborate defendant's assertion she had less hours due to the doctor's retirement or needed to reduce her hours to be home for the younger child.  Defendant presented no evidence of a job search "that would have kept her income on par with prior years."  The drop in her income in 2021 was suspect because it occurred "after the parties decided to divorce." The judge imputed defendant with an annual gross income of $95,000.

The trial judge found plaintiff had "grossly understated" the marital lifestyle because his CIS reduced the schedule A, B, and C expenses by basic costs the parties would necessarily incur given their standard of living.  The figures in plaintiff's CIS were not believable because "given the parties' respective incomes, they would have surplus cash each month and a lot more in savings.  However, it is undisputed that, by the time of trial, they had virtually

no assets." Instead, they had little equity in their home, IRS debt, and "accumulated very little savings during the marriage." There were also a few expenses on defendant's CIS that were "slightly high or improperly included[,]" which the judge adjusted or disregarded.

Overall, the judge found the figures in defendant's CIS more reasonably described the parties' "upper middle-class" lifestyle. She concluded "a reasonable statement of the joint marital lifestyle was $23,742" per month.

The trial judge also addressed the parties' current needs. After reducing certain expenses, which the judge explained were excessive, she found defendant's needs were $10,669 per month. "[T]he bulk of [plaintiff's] expenses [were] reasonable." After explaining the adjustments she made to his budget, she concluded his reasonable monthly needs were $7,649.

The trial judge noted plaintiff admitted he invaded the children's 529s for non-educational purposes and non-qualified expenses. She rejected his claims defendant knew about the withdrawals because they were made before the divorce and were necessary to pay the family's expenses. Plaintiff's testimony was not believable because he "was unable to articulate how the money was spent making the [c]ourt question whether it was truly for marital expenses." He also failed to deposit checks from defendant's parents intended for the

children's 529 accounts. She found plaintiff's claim the checks were not earmarked for the 529s "coy and dishonest" because the parties had a history of depositing funds into the 529s.

After these factual findings, the trial judge addressed the alimony demand. She analyzed the facts under each statutory factor, which we need not recite here. The parties agreed defendant was entitled to open durational alimony and it was "undisputed that [defendant] was economically dependent on [plaintiff] through[out] the marriage." The issue was the amount of alimony.

The judge rejected the proposal to pay alimony using a base income for plaintiff of $275,000 and then supplementing it based on his additional earnings because he controlled his income by virtue of operating "a single member LLC [and] . . . has the power to pass certain expenses through his business." Plaintiff's ability to manipulate his income and defendant's lack of information about his business's operations would leave defendant at plaintiff's mercy. The judge rejected plaintiff's assertion his income fluctuated and concluded the $275,000 was "grossly low."

The trial judge calculated alimony using imputed incomes of $425,000 and $95,000 for plaintiff and defendant, respectively. She reasoned if alimony were based on defendant's basic needs of $4,500 per month, it would leave

plaintiff with a substantial surplus. This would be unfair to defendant, especially considering "the largest single reason for the parties having to live below the marital standard is due to [plaintiff's] refusal to fully pay himself" from the fees held in escrow from the New York case. The judge set alimony at $6,000 per month because it would allow both parties to live "reasonably similar" to the standard they shared while married. This figure also acknowledged the parties "have been living frugally and in a manner that is not consistent with the marital lifestyle" largely due to "living above their means during the marriage and having to make adjustments once living apart" as well as "exorbitant counsel and expert fees they have paid to drag out this litigation."

The judge evaluated child support by applying the statutory factors because the children were over the age of eighteen, attending college away from home for most of the year, and the parties' combined incomes exceeded the child support guidelines. She assessed each factor and concluded the children's reasonable expenses totaled $1,617 per month. The judge set child support at $1,000 per month to be reduced to $800 per month once the older child became emancipated following his graduation from college. She apportioned the unreimbursed medical, auto, cell phone, and extracurricular activity expenses

between plaintiff and defendant on a fifty-five/forty-five percent basis, respectively.

Pursuant to Newburgh v. Arrigo, 88 N.J. 529, 545 (1982) factors, the trial judge concluded the parties should be responsible for the children's college expenses.  Regarding the 529s, the judge found plaintiff "unilaterally" took funds from each child's account and there was "no doubt" defendant "was wholly unaware of these withdrawals."  Plaintiff's reasons for not depositing the checks from defendant's parents into the 529s was also "wholly lacking in believability."  The judge was convinced defendant would not have permitted plaintiff to withdraw money from the 529s if she had "been aware it was happening."  Plaintiff was "solely responsible for dissipating the children's college funds."

Because of the $102,500 plaintiff dissipated from the older child's account, "that would have otherwise been available to pay for [his] sophomore and junior years," plaintiff would be solely responsible for repaying that child's loans totaling $110,000.  Even if the funds from the older child's account had not been dissipated, the parties would have run out of money to fund his senior year of college.  So, the judge held that after applying the $3,000 remaining in

that child's 529, the parties would pay for senior year in proportion to their incomes on a fifty-five/forty-five percent basis.

The judge followed a like methodology for the younger child's college expenses. They would proportionately share responsibility for a loan defendant took to fund the freshman year of college, but due to plaintiff's dissipation, he would be solely responsible to pay for sophomore year after deduction of the child's subsidized loan and work-study program funds. The parties would then resume paying their proportionate share of junior and senior year after the $9,100 remaining in the 529 was exhausted and deduction of subsidized loans and work-study funds.

As relates to this appeal, the judge found the following assets subject to equitable distribution: the marital home; plaintiff's law practice; trailing fees from four cases plaintiff generated with his former partner; and stock and retirement accounts. The judge also addressed equitable distribution of the parties' liabilities, including the: HELOC; IRS debt; and taxes associated with the liquidation of retirement accounts.

The judge applied the facts to each equitable distribution statutory factor. Although she found both parties equally contributed to the acquisition and dissipation of the marital assets, plaintiff failed to return $75,000 he withdrew

from his retirement account pendente lite.  The judge also observed the $182,500 was "unilaterally" withdrawn from the children's 529s.  Defendant took $60,000 of marital funds, which she used to pay her counsel fees and the debt to her parents.

The judge awarded defendant $11,933, representing one-half of the equity in the former marital residence "the parties would have had in the home had [plaintiff] paid the mortgage and HELOC from April 2020 through the sale date."  She noted plaintiff, as the breadwinner, historically paid the mortgage and HELOC.  He unilaterally increased the family's expenses and in turn his inability to pay the debt encumbering the marital home when he decided to move out and incur rent of $2,900 rather than reside in the pool house, "which was really a full guest house[]."  He also accumulated $30,000 to $50,000 in savings pendente lite, which could have paid the mortgage and HELOC.

Plaintiff proposed defendant receive 33.3% of the value of his law practice, which he would pay at a rate of $200 per month and then $600 per month when the older son emancipated.  He would pay defendant more if he earned over $400,000.  The judge found the proposed payment plan "eminently unreasonable" and the offer to increase the payment if plaintiff earned more "a farce, since he can manipulate his income as the sole owner of his firm."  The

judge awarded defendant $104,000, representing forty percent of the value of the business, payable over four years with four percent interest. She noted he could pay the sum once he disbursed funds to himself from the New York case.

The judge granted defendant's request for fifty percent of the net trailing fees received by plaintiff from four cases belonging to his former firm, which were generated during the marriage and pending during the divorce. Citing M.G. v. S.M., 457 N.J. Super. 286 (App. Div. 2018), the judge likened the fees "to a stock option awarded after the marriage ended but obtained as a result of the efforts expended during the marriage." Plaintiff had entered a fee sharing arrangement prior to the firm's dissolution. The judge found although his "former partner may have to do more work before collecting these fees, [plaintiff] does not need to perform any additional work. His interest in these fees is based entirely on work that he already performed . . . prior to the divorce."

The judge awarded defendant $20,625 in equitable distribution from plaintiff's 401k representing one-half of the net proceeds of the account. She found that if plaintiff had paid himself from the New York case, he could have re-paid the 401k loan, and defendant's request was "more than generous given that the [consent o]rder specified [plaintiff] would be responsible for any penalties as a result of the withdrawal."

23

The judge divided the $102,000 IRS debt on a sixty-forty percent basis between plaintiff and defendant, respectively. She found the debt was undoubtedly incurred on plaintiff's income because defendant was either unemployed or had her taxes deducted as a W-2 employee, whereas plaintiff was responsible to make quarterly tax payments as a self-employed business owner.

The judge rejected plaintiff's request for a Mallamo credit. Based on the imputed income the final alimony figure was $500 more than the pendente lite alimony and the child support was the same as the pendente lite award.

Based on the totality of the equitable distribution and the other credits owed between the parties, the judge directed plaintiff to pay defendant $21,489.20 within thirty days of the final judgment. This figure was separate from the trailing fees.

The judge ordered the parties to submit under seal "their last, best[,] and final settlement offer," which she would consider in deciding their respective requests for counsel fees and costs. On May 16, 2023, the judge issued a written opinion, in which she applied the facts to the RPC 1.5(a) and Rule 5:3-5(c) factors. She recounted the parties' respective settlement offers and the equitable distribution, alimony, and child support awards. The judge recited in detail the

counsel and expert fees incurred and paid during the pendency of the case, and the amounts still outstanding.

The judge concluded plaintiff was "in the superior financial position" and defendant "had no ability to pay her own fees during the pendency of the divorce." Plaintiff had the greater ability to pay because he saved money during the divorce and had access to the funds from the New York case. Defendant was "the more reasonable party and has proceeded in good faith throughout this matter."

Plaintiff's "lack of reasonableness [was] plainly evident when reviewing his final settlement offer when compared to [defendant], and particularly when compared to the [c]ourt's ultimate trial decision." The judge noted she awarded alimony of $1,600 per month more than what plaintiff had proposed. Plaintiff's position regarding his income was unreasonable because it "was entirely inconsistent with his average income as established for many years before the divorce." The judge recounted the many ways plaintiff had manipulated his income after the divorce began. Plaintiff suggested an unreasonable payout schedule for defendant's share of the business and "refused to offer [defendant] any portion of the trailing fees" or a credit against the funds taken from his 401k, the dissipation of the marital residence, or the 529s.

"In sharp contrast, [defendant's] settlement offer was far more reasonable than what [plaintiff] proposed. In fact, had [plaintiff] accepted [defendant's] settlement proposal, he would have fared far better than how the [c]ourt ruled in its decision." Defendant "was the more reasonable party and proceeding in good faith . . . [and plaintiff] took unreasonable positions, engaged in 'scorched earth' litigation, and did not consistently proceed in good faith."

The parties' counsel fees submissions showed defendant incurred nearly $44,000 more in counsel fees than plaintiff. Defendant received nearly $26,000 in counsel fees more than plaintiff during the case and paid her attorney $80,000 more than plaintiff paid his. The judge noted defendant "prevailed in all aspects of relief sought." It was "clear . . . [plaintiff's] unreasonable settlement position is the principal reason the parties had to engage in a long, expensive trial."

The judge held plaintiff would be responsible for the payment of his own counsel fees and would not receive a credit for the counsel fees he paid defendant pendente lite. She ordered plaintiff to bear seventy-five percent of defendant's counsel fees "incurred for trial preparation and trial[,]" which the judge calculated to $63,929.25. The judge ordered plaintiff to pay this sum by liquidating three investment accounts within thirty days. She also ordered him to transfer the balance of the fees from the New York case from his trust account

26

to his operating account to pay the balance of what was owed to defendant for counsel fees. If the funds from the investment and trust accounts did not suffice, plaintiff would then have ninety days to pay defendant the balance owed.

## I.

"[F]indings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Deference is also accorded to a trial judge's credibility determinations because the judge "hears the case, sees and observes the witnesses, and hears them testify," affording them "a better perspective than a reviewing court in evaluating the veracity of a witness." Id. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).

We are bound to accept a trial judge's conclusions when they are supported by the evidence. Ibid. If we conclude there is satisfactory evidentiary support for the judge's findings, our "task is complete and [we] should not disturb the result." Beck v. Beck, 86 N.J. 480, 496 (1981) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). We will "disturb the factual findings and legal conclusions of the trial judge [if] we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably

credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974).

Family Part judges have broad discretion to allocate assets subject to equitable distribution, Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012), and to make alimony determinations. Martindell v. Martindell, 21 N.J. 341, 355 (1956). Child support determinations are reviewed for an abuse of discretion. Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012). Income imputation decisions are also discretionary, Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004), as are counsel fee determinations. Barr v. Barr, 418 N.J. Super. 18, 46 (App. Div. 2011).

We do not "accord the same deference to a trial judge's legal determinations. Rather, all legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

II.

Plaintiff challenges the judge's: imputation of income to him and inclusion of the fees from the New York case into its calculations; finding that plaintiff manipulated his advertising costs to decrease his income; disregard of his declining income and increasing debt; the marital lifestyle calculation, which

did not support the income imputed to him; and imputation of income to defendant. He claims the improper imputation led to the wrongful denial of his request for a <u>Mallamo</u> credit. He also contends the judge erred in calculating defendant's needs because her budget contained expenses she did not incur for herself, which led to a windfall of alimony and child support.

### A.

We discern no abuse of discretion in how the judge derived either party's income. The judge's findings regarding plaintiff's income and his manipulation thereof were not only based upon the substantial credible evidence in the record, but also hinged on his lack of credibility. We owe those findings deference because the judge spent days observing the testimony, and her conclusions are supported by the greater weight of the evidence.

The decision to include plaintiff's half of the fees from the New York case in the income calculation was sound. The judge relied on a New York law, which states:

> All attorney's fees approved by the court for the prosecution for the wrongful act, neglect or default, inclusive of all disbursements, shall be immediately payable from the escrow account upon submission to the trial court proof of filing of a petition for allocation and distribution in the surrogate's court on behalf of the decedent's estate.

[N.Y. Est. Powers & Trusts Law § 5-4.6(a)(2).]

The statute also provides "[t]he attorney for the administrator or personal representative in the action for wrongful act, neglect or default who receives payment under this section shall continue to serve as attorney for the estate until the entry of a final decree in the surrogate's court." Id. § 5-4.6(a)(3).

Haag explained § 5-4.6 was enacted "to confirm the procedure for trial counsel to obtain timely compensation for their efforts in wrongful death matters," and "[t]he procedures in that statute are intended to be strictly adhered to by practitioners seeking relief in supreme or federal court." 43 N.Y.S.3d at 878. Further, "under New York law, legal work associated with the wrongful death action is within the scope of work included in the fee allowance in that action." Id. at 876. "Additional compensable legal representation is required only to the extent there are other estate issues which also need to be concluded to close the estate." Ibid. To the extent there are other issues, an attorney's "allowed fees will be allocated against the estate." Ibid. Therefore, any additional legal fees associated with other issues unrelated to the wrongful death action, such as creditors or objections, "will only be payable from the net estate, not from the wrongful death portion of the recovery." Id. at 878.

Plaintiff points us to In re Estate of Henry, 951 N.Y.S.2d 86 (N.Y. Sur. Ct. 2012). There, the court held "counsel who receives a contingent fee based upon the amount of the recovery in the underlying action is usually required, without the right to receive any additional compensation, to provide or pay for all legal services in the proceeding before [the surrogate's court] to enable distribution of recovery." Ibid. However, where "the issues raised by objections resulted in another counsel preparing for and participating in a contested trial," the court may grant that counsel fees associated with their services in the surrogate's court. Ibid.

Henry does not convince us the judge erred. Even if plaintiff was going to incur more fees in the surrogate matter, the surrogate's court was empowered to grant additional fees. Ibid. Moreover, Haag holds the additional fees related to the surrogate matter are drawn from the net proceeds of the estate, not the wrongful death recovery. 43 N.Y.S.3d at 878.

The judge neither misapplied her discretion nor misinterpreted the law. She correctly concluded plaintiff was entitled to his entire share of the fees when the court approved them. We note the petition to allocate the settlement proceeds was filed in the surrogate court on October 5, 2020. Although under other circumstances, it may have been reasonable for plaintiff to argue and the

31

judge to accept that he left fees in escrow until the work in the surrogate matter was completed, the judge's decision was colored by plaintiff's lack of credibility and the family's dire circumstances.

We reject the assertion that reversal is warranted because the judge's final ruling contradicted her pendente lite order dated June 23, 2021. In that order, the judge stated she understood why the fees had to remain in escrow and held the full amount could not be distributed until the surrogate's court matter resolved. However, the judge did not have the benefit of the evidence adduced at trial, including an understanding of plaintiff's machinations.

It is axiomatic that pendente lite orders are without prejudice and temporary in nature because they "are entered largely based upon a review of the submitted papers supplemented by oral argument." Mallamo, 280 N.J. Super. at 16. A trial judge will not be constrained by their pendente lite order because

> [a]bsent agreement between the parties, . . . a judge will not receive a reasonably complete picture of the financial status of the parties until a full trial is conducted. Only then can the judge evaluate the evidence, oral and documentary, and weigh the credibility of the parties. Only then can the judge determine whether the supporting spouse has the economic means represented by the other spouse or in the case of declining income has suffered legitimate economic reversal or has been afflicted with a

32

A-2754-22

> temporary case of diminished resources occasioned by a divorce.
>
> [Ibid.]

Plaintiff contends there is no proof his share of the New York fees would be fifty percent. This argument lacks merit. Plaintiff and co-counsel billed at the same rate and entered an agreement to share the fees. Whenever funds were released from escrow, plaintiff and co-counsel split them equally. Indeed, plaintiff received $200,000 of the $400,000 released in October 2000 and $50,000 of the $100,000 released in 2021. Plaintiff further testified he had "expected" to receive $417,500 for his total portion, which was half of the total fee earned.

### B.

We reject plaintiff's arguments the judge erred in calculating his income because she disregarded the legitimacy of his marketing costs and concluded he was manipulating his income. The judge's decision fell within the penumbra of her income imputation powers.

We have stated that "[i]mputation may . . . be justified when examining income reported by self-employed obligors, who control the means and the method of their earnings." Elrom v. Elrom, 439 N.J. Super. 424, 436 (App. Div. 2015) (citing Donnelly v. Donnelly, 405 N.J. Super. 117, 128-29 (App. Div.

2009)).  This is because "a self-employed obligor . . . is 'in a better position to present an unrealistic picture of [their] actual income than a W-2 earner.'" Donnelly, 405 N.J. Super. at 128-29 (quoting Larbig v. Larbig, 384 N.J. Super. 17, 23 (App. Div. 2006)).  In deciding whether a trial court abused its discretion in its imputation reasoning, "[w]e focus on the facts supporting imputation." Elrom, 439 N.J. Super. at 436.

In Donnelly, we upheld a trial judge's denial of a motion to modify alimony and child support where the payor, also an attorney, claimed his income had decreased due to increased competition and office expenses.  405 N.J. Super. at 122.  The trial judge rejected the payor's arguments because the evidence showed the reduction of his income was due to the fact he "had taken on considerable debt and adopted a lavish lifestyle inconsistent with the way his law practice was . . . trending."  Id. at 129.

The lesson from Donnelly was that "the alleged reduction in income was only part of the overall circumstances [the trial judge] was required to consider in determining whether" the payor had established a basis for the relief sought. Id. at 130.  "The trial court must consider—in both fixing and altering a support obligation—what is equitable and fair in all the circumstances. . . .  This requires

not only an examination of the parties' earnings but also how they have expended their income and utilized their assets." Ibid.

Here, like Donnelly, the judge considered the entirety of the circumstances. The objective evidence showed plaintiff spent a sum of money on advertising post-complaint that was exponentially greater than the sums spent during the marriage. The judge did not have to accept that the spike in advertising expenses was legitimate given the pendente lite circumstances. Her conclusion the timing of increased expenses was suspect is amply supported by the record. We discern no abuse of discretion.

## C.

Plaintiff challenges the judge's income imputation because she ignored his declining income and debts in imputing him income. He claims she also erred because she did not consider that his income always fluctuated and should have used a three-year rather than a five-year average to impute his income. She ignored the joint expert's cash flow analysis and made her own income calculations, which were unsupported by the record. The judge also treated the parties in a disparate manner by imputing a low income to defendant.

In exercising their discretion, Family Part judges may calculate a party's income for alimony and child support purposes by averaging it. Elrom, 439 N.J.

35

Super. at 435. A judge is not limited to the income earned prior to the complaint for divorce and may include post-complaint earnings to better understand the fluctuations in a party's income to establish support. See Platt v. Platt, 384 N.J. Super. 418, 426-27 (App. Div. 2006) (affirming the use of a five-year average of an obligor's income plus two years following the complaint, where the obligor purposely reduced his post-complaint income despite his business performing well).

These legal principles and the facts in the record convince us the judge's imputation of income was neither an abuse of discretion nor a misapplication of law. The judge acknowledged plaintiff's income fluctuations by averaging his earnings in accordance with his earning capacity. She used the last five years of plaintiff's earning because the income he earned before that was not representative of his earning capacity, as it was "during the early stages of his career," and "it took some time to build his career and reputation."

The earnings period considered by the judge also included the post-complaint era and by necessity required the judge to consider, albeit reject, the alleged downturn in plaintiff's income generation. The judge considered the cashflow figures from the expert, augmented by the fees from the New York case. Setting aside the fact the joint expert's role was to opine about cash flow,

rather than reach a legal conclusion regarding income imputation, "a trial judge may accept or reject an expert's opinion in its entirety, or may accept only some of the expert's opinion." Reese, 430 N.J. Super. at 581 (citing Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002)). Therefore, that the judge's imputation was $425,000 as opposed the expert's figure of $399,174 does not convince us there was reversible error.

Likewise, there was no abuse of discretion or disparate treatment in the imputation of income to defendant. Although defendant's testimony was mostly credible whereas plaintiff's was not, the judge rejected defendant's claims about why her income declined in 2021 and imputed a robust income to her. These findings show the judge critically analyzed the facts and evidence presented by both parties. Her findings were supported by the substantial, credible evidence in the record.

D.

Plaintiff argues the marital lifestyle findings do not support the income imputed to him. He claims the judge misapplied the law because she recognized the marital lifestyle was that the parties lived beyond their means yet allowed that lifestyle to drive her decision without regard to plaintiff's ability to pay.

"[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). "The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income." Hughes v. Hughes, 311 N.J. Super. 15, 34 (App. Div. 1998). "In many cases, parties live above their means or spend their earnings and assets to meet expenses. In such instances, a finding of the marital lifestyle must consider what the parties spent during the marriage . . . ." S.W. v. G.M., 462 N.J. Super. 522, 532 (App. Div. 2020).

> In a contested case, a trial judge may calculate the marital lifestyle utilizing the testimony, the CISs . . . , expert analysis, . . . and other evidence in the record. The judge is free to accept or reject any portion of the marital lifestyle presented by a party or an expert, or calculate the lifestyle utilizing any combination of the presentations.
>
> [Ibid.]

In S.W., we noted that "[c]ontained in most marital budgets are expenses, which may not be associated with either the alimony payor or payee, including those associated with children who have since emancipated or whose expenses are met by an asset or a third-party source having no bearing on alimony." Id.

at 533. There may be "an expense [that] is unrelated to either the payor or the payee but is met by that party on behalf of a child. And, . . . there are expenses which only one party incurred during the marriage." Id. at 533-34. "Therefore, after finding the marital lifestyle, a judge must attribute the expenses that pertain to the supported spouse. Only then may the judge consider the supported spouse's ability to contribute to [their] own expenses and the amount of alimony necessary to meet the uncovered sum." Id. at 534.

Having considered the record and the judge's lifestyle findings, which we previously recounted, we roundly reject plaintiff's challenges. The judge's findings adhered to the law, and we discern no reason to disturb her findings.

We also reject the suggestion the judge incorrectly assessed defendant's needs. Defendant testified regarding the current monthly expenses for herself and both children. She explained how long each child resided with her when they were not in college. The court found her testimony about the expenses reasonable and where it was not, adjusted defendant's budget, particularly to those expenses affected by the children's residence away at college. The record supports the conclusion defendant's reasonable monthly expenses were $10,669.

Based on an imputed income of $95,000 per year, defendant's net monthly income was $6,250, leaving her with a deficit of nearly $4,500 per month. In

recognition of the marital lifestyle and the fact that defendant's bare needs were not the measure of alimony, the judge awarded her $6,000 to enable her to "maintain a lifestyle that is reasonably comparable to the marital lifestyle" while providing plaintiff "sufficient remaining income to live relatively comfortable" and similar to his past lifestyle. Again, the judge neither misapplied the facts nor misinterpreted the law. And, because the final alimony award was fair under the circumstances and supported by the evidence in the record, plaintiff was not entitled to a Mallamo credit.

We reject the argument the judge did not consider plaintiff's ability to pay. Based on the income imputed to plaintiff, his net monthly income was $25,833. His needs were $7,649, which left him with a monthly surplus of $18,184. This sum was more than enough money to meet the monthly alimony and child support obligations, and in addition to the fees from the New York case, it was enough to pay the limited equitable distribution award.

## III.

Plaintiff challenges the judge's equitable distribution determination. He asserts: the IRS debt should have been divided equally; he should not have been ordered to pay defendant $11,933 representing half the equity in the marital residence because the judge erred when she found he could have cut expenses

40

by residing in the pool house and he only managed to save money pendente lite after the home sold; the judge did not explain how she calculated the equity figure; it was error to award defendant a credit of $10,625 for the funds withdrawn from plaintiff's retirement account and sixty percent of the taxes resulting from the liquidation; the judge likewise erred when she found the trailing fees were subject to equitable distribution; defendant should not have received forty percent of the value of his law practice; and defendant failed to meet her burden of showing a dissipation of the 529s. Plaintiff claims the judge ignored the interrelationship between alimony and equitable distribution and disregarded his ability to pay both obligations.

Our review of equitable distribution determinations is narrow. Valentino v. Valentino, 309 N.J. Super. 334, 339 (App. Div. 1998). We decide only whether the trial court "mistakenly exercised its broad authority to divide the parties' property and whether the result was 'reached by the trial judge on the evidence, or whether it is clearly unfair or unjustly distorted by a misconception of law or findings of fact that are contrary to the evidence.'" Ibid. (quoting Wadlow v. Wadlow, 200 N.J. Super. 372, 382 (App. Div. 1985)). "A sharp departure from reasonableness must be demonstrated before our intercession can

41

be expected." Wadlow, 200 N.J. Super. at 382 (quoting Perkins v. Perkins, 159 N.J. Super. 243, 248 (App. Div. 1978)).

"The goal of equitable distribution is to effect a fair division of marital assets." Steneken v. Steneken, 183 N.J. 290, 299 (2005). The trial judge must identify the assets subject to equitable distribution, value the assets as of the date of complaint, and determine how the assets should be distributed between the parties. Rothman v. Rothman, 65 N.J. 219, 232 (1974). Pursuant to N.J.S.A. 2A:34-23.1, the Legislature has provided sixteen factors the trial judge must utilize in making an equitable distribution.

N.J.S.A. 2A:34-23.1 "reflects a public policy that is 'at least in part an acknowledgment that marriage is a shared enterprise, a joint undertaking, that in many ways . . . is akin to a partnership.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 284 (2016) (omission in original) (quoting Smith v. Smith, 72 N.J. 350, 361 (1977)). The statute "advance[s] the policy of promoting equity and fair dealing between divorcing spouses." Barr, 418 N.J. Super. at 45. "This requires evaluation of unique facts attributed to each asset." Slutsky v. Slutsky, 451 N.J. Super. 332, 358 (App. Div. 2017).

We reject plaintiff's arguments, which ostensibly quibble with the judge's decision in some instances to divide assets on other than an equal basis. Our

Supreme Court has stated that an equitable distribution does not mean an equal distribution. See Rothman, 65 N.J. at 232 n.6. Moreover, the judge followed the law by making detailed factual findings as to percentages of the equitable distribution allocated to each party from each asset and liability. Her findings are unassailable.

"[I]t may not be an abuse of judicial discretion to divide the assets of the parties equally without requiring them to share the debts." Monte v. Monte, 212 N.J. Super. 557, 567 (App. Div. 1986). This is because "[e]ven if debts are determined to be marital, they could be allocated to one party based upon [their] greater earning potential." Ibid. "However, if the debt resulted because [a party] intentionally dissipated marital assets 'such intentional dissipation is no more than a fraud on marital rights,' and the debt will not be charged to the [non-dissipating party]." Id. at 567-68 (quoting Sharp v. Sharp, 58 Md. App. 386, 398 (1984)).

The concept of dissipation "is a plastic one, suited to fit the demands of the individual case." Kothari v. Kothari, 255 N.J. Super. 500, 506 (App. Div. 1992). In determining whether a spouse has dissipated marital assets, courts consider the following factors:

> (1) the proximity of the expenditure to the parties'
> separation, (2) whether the expenditure was typical of

expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefitted the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and amount of, the expenditure.

[Id. at 507 (quoting Lee R. Russ, Spouse's Dissipation Of Marital Assets Prior To The Divorce As A Factor In Divorce Court's Determination Of Property Division, 41 A.L.R. 4th 416, 421 (1985)).]

"The question ultimately to be answered by a weighing of these considerations is whether the assets were expended by one spouse with the intent of diminishing the other spouse's share of the marital estate." Ibid.

The uneven distribution of the IRS debt was supported by several facts, including that plaintiff earned all if not most of the money during the marriage, and even when defendant was employed, he outearned her by more than fourfold. A similar logic applied to the uneven distribution of the tax liability on the liquidation of plaintiff's retirements accounts.

The decision to award defendant $11,933[3] from what would have been the equity from the marital residence was an effort by the judge to compensate defendant for plaintiff's dissipation of this asset. Indeed, the undisputed

---

[3] Plaintiff asserts the record does not support how the judge arrived at this figure. However, the amount was derived by adding the payoff of the mortgage and HELOC at closing of $17,890.84 and $5,730.14, plus $246.26 of late charges, which totaled $23,867.24, and dividing the figure in half.

evidence showed plaintiff: failed to pay the mortgage and HELOC even though he typically paid them during the marriage; accumulated between $25,000 and $30,000 in savings when he left the home in September 2019 while not paying these expenses; and incurred a rental expense, which he paid instead of the debt encumbering the marital residence, rather than reside in the secondary residence. The judge's decision was a sound exercise of her discretion and there was no reversible error.

We reach a similar conclusion regarding the award of $10,625 to defendant for half of the net proceeds withdrawn by plaintiff from his retirement account. The award compensated defendant for plaintiff's violation of the parties' May 21, 2020 consent order in which plaintiff agreed to repay the amount withdrawn by December 31, 2020.

It is evident from the record that plaintiff dissipated the children's 529s. He did not inform defendant about his withdrawals and failed to convince the judge he spent the funds on qualified college expenses or expenses related to the children. Plaintiff also never deposited money that was earmarked by the children's maternal grandparents for their college accounts. All this conduct left the children without funds for college, yet the judge did not solely burden plaintiff with the college obligation. Her thoughtful decision reflects that

A-2754-22

plaintiff was held accountable for the dissipation and thereafter the parties shared in the obligation to fund the children's educations based upon their respective abilities and resources.

The judge's decision to treat the trailing fees from the four cases generated by his prior firm as equitable distribution rather than income and divide them equally between the parties was neither an abuse of discretion nor a misapplication of law. The judge found the fees were "based upon work that was performed during the marriage" and were "not contingent upon [plaintiff] doing any additional work."

There was a rebuttable presumption the trailing fees were subject to equitable distribution. See M.G., 457 N.J. Super. at 302 (holding in the context of stock award that "[w]here the award is made during the marriage, but vests following the date of complaint, there is a rebuttable presumption the award is subject to equitable distribution unless there is a material dispute of fact regarding whether the stock, either in whole or in part, is for future performance"). Our review of the record convinces us plaintiff did not rebut the presumption the trailing fees were marital assets. His testimony confirmed these clients retained his firm during the marriage and he had to do nothing to get paid except await the conclusion of their cases. The judge's analogy to M.G. was apt.

46

We reject plaintiff's argument the trailing fees were double counted as income for alimony purposes. These fees were not part and parcel of the expert's valuation of plaintiff's income or the business valuation. Even if they were, our Supreme Court has held there is

> no inequity in the use of the individually fair results obtained due to the use of an asset valuation methodology normalizing salary in an on-going close corporation for equitable distribution purposes, and the use of actual salary received in the calculus of alimony. The interplay of those two calculations does not constitute "double counting."
>
> [Steneken, 183 N.J. at 301-02.]

The alimony and equitable distribution awards here were "individually fair results." Ibid. We are unconvinced there was improper double dipping of the trailing fees as both equitable distribution and income to pay alimony. Plaintiff's income imputation did not include these fees because they were not yet realized.

The judge's decision to award defendant forty percent of the value of plaintiff's law practice was not reversible error. Rather, it was a recognition of the fact the practice was entirely marital and that plaintiff "was able to grow his business and create a lucrative practice because he was able to work many hours

each day in New York City, while [defendant] stayed home and cared for the children," sacrificing her career for his.

IV.

Plaintiff challenges the judge's award of counsel fees. He claims the judge improperly interfered with his business operations by ordering him to transfer the fees from the New York case from escrow.

As we recounted, the judge made detailed findings on each Rule 5:3-5(c) factor, which we need not repeat here. The result was that, with few exceptions, all the applicable factors weighed in defendant's favor and an award of fees to her. These findings also refute plaintiff's argument the judge awarded fees by relying exclusively on the consideration of the parties' sealed settlement positions.

The judge found plaintiff would be responsible for his own counsel fees and would not be entitled to any credit for counsel fees paid to defendant from marital funds. Although defendant "received $25,567.19 more in counsel fees from marital funds than [plaintiff] during the divorce, she earned far less than [him]" and "much of these fees were incurred attempting to secure much needed support from [him] or in attempts to move [him] from his settlement position." The judge ultimately found that plaintiff would be responsible for seventy-five

48

percent of the fees defendant incurred to prepare for and try the matter because plaintiff's positions, in essence, forced the trial.

We discern no abuse of discretion and affirm for the reasons expressed in the judge's May 16, 2023 opinion. The substantial, credible evidence in the record supported an award of counsel fees to defendant. We decline to second-guess the judge's reasoned decision.

V.

Plaintiff's notice of appeal states he is also challenging two post-judgment orders dated July 7, 2023, which denied his motion to stay the judgment of divorce and the counsel fee award and denied his motion for reconsideration and granted defendant's motion to enforce. We decline to address these items because plaintiff has not briefed them and "an issue not briefed is deemed waived." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2024); see also Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief).

Even if these arguments were discussed in plaintiff's brief, they would not be cause for reversal. We review reconsideration and enforcement decisions under an abuse of discretion standard and here there was none. See Granata v.

Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016); Barr, 418 N.J. Super. at 46.

Plaintiff was not entitled to a stay because the judge correctly found under Crowe v. DeGioia, 90 N.J. 126 (1980): there was no irreparable harm on account that the relief sought was monetary; plaintiff lacked a settled right to the relief; the law supporting her decisions was settled; and the equities on balance did not favor plaintiff. Likewise, there were no grounds to grant reconsideration and every reason to grant enforcement of the judge's rulings.

## VI.

To the extent we have not addressed an argument raised on appeal, it is because it lacks sufficient merit to warrant discussion a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2754-22